Bernard FERGUSON, Appellant,

v.

The STATE of Texas, Appellee.

No. 58706.

Court of Criminal Appeals of Texas,
En Banc.

Sept. 20, 1978.

Appellant's Motion for Rehearing En Banc
Denied Oct. 18, 1978.

Troy C. Hurley, Killeen, Gerald M. Brown, Temple, for appellant.

Arthur C. Eads, Dist. Atty., James T. Russell and Ralph Petty, Jr., Asst. Dist. Attys., Belton, for the State.

## OPINION

DALLY, Judge.

This is an appeal from a conviction for capital murder; the punishment is death.

Appellant contends that: (1) the court erred in denying his request for a postponement of the jury selection when a venire member failed to timely appear; (2) a sample of appellant's blood was obtained by an unlawful search and seizure and should not have been admitted in evidence; (3) other items were obtained by an unlawful search and seizure and should not have been admitted in evidence; (4) the court erred in refusing to submit to the jury the appellant's requested charge on accomplice witnesses; (5) the court erred in refusing to submit to the jury the appellant's requested charge on circumstantial evidence; and (6) the court erred in failing to declare a mistrial after the prosecutor made a sidebar remark.

The offense occurred at approximately 11:45 p. m. on January 25, 1977. The deceased, Randy Tingle, was an attendant at a convenience store in Killeen. He died from loss of blood caused by four stab wounds in the back. It was established by expert medical testimony that the size of the wounds was compatible with a knife having been twisted after it was thrust into the body. Approximately $28 was taken from the cash register of the store.

Appellant was arrested at approximately 3:30 a. m. on January 26 as he and one Jody Persons arrived in a car at a residence on Avenue J in Killeen. Blood was found on the jacket and pants which appellant was wearing as well as the cuff of the jacket, which had been torn off and stuffed into appellant's boot. There also was blood on a knife which was found at the residence, on gloves which appellant had been wearing, and on currency found in appellant's billfold. The blood on the knife, jacket and cuff was shown to be of the same type as that of the deceased; tests of the blood on appellant's pants were inconclusive, but it was shown to be of a type similar to that of the deceased. A .357 magnum pistol was found in the car which appellant had been driving.

Jody Persons and Bob McGuinn were accomplice witnesses as a matter of law, and

the jury was so charged. McGuinn, who owned the automobile which appellant had been driving, testified as follows concerning the events surrounding the commission of the offense: On the morning of January 25, 1977, he saw appellant at a bowling alley in Killeen. Appellant had a .357 magnum in a brown paper bag and told McGuinn that he planned to "rob a store." Later that day McGuinn was present at a duplex on Avenue J in Killeen with appellant, Persons, Louis Ferguson and Frank Robbins; appellant had the same gun and also had a knife which McGuinn testified was the knife recovered from the apartment the next day. Appellant told the others present of his plan for "robbing a store" that night and asked them to accompany him. Robbins and Louis Ferguson declined to participate, but Persons and McGuinn agreed to go with appellant. During this discussion appellant cocked the pistol and pointed it at McGuinn's head; appellant told the others he would kill them all if they turned on him. Later that evening, appellant left with McGuinn and Persons in McGuinn's car, a 1973 silver Dodge Charger with black stripes. They drove around Killeen for some time looking for a store at which to commit a robbery and finally went to the store at which the deceased worked. McGuinn parked at the fuel pump outside the store and put $5 worth of fuel in the car while appellant and Persons entered the store. McGuinn then parked the car in front of the store. Shortly thereafter, appellant and Persons came out of the store; appellant was carrying a package which contained money, and Persons was carrying a carton of cigarettes. After appellant and Persons got into the car with McGuinn and the three of them departed, appellant took a pair of gloves out of the glove compartment of the car and put one on. McGuinn noticed that appellant had blood on his arm and hand and was carrying a knife. Before they left, McGuinn looked through the store window and saw the deceased using the telephone; something was covering the deceased's face. Persons, McGuinn and appellant returned to the duplex on Avenue J; on the way there, McGuinn noticed that

appellant had "more or less a half-smile." Upon arriving at the apartment, appellant took some money from a cigarette carton and gave $2 each to McGuinn, Robbins, and Louis Ferguson. Some time later, McGuinn gave Persons permission to drive his car, and appellant and Persons again left the apartment. McGuinn, Robbins, and Louis Ferguson then went and bought some food, ate it, and went to sleep. They were awakened at approximately 3:30 in the morning, when appellant and Persons returned and were arrested.

Persons testified to substantially the same facts as did McGuinn concerning the conversation during which appellant outlined his plan for committing a robbery and threatened to shoot his companions if they did not cooperate with him. Persons testified that appellant was carrying the pistol and knife when they entered the store and that appellant handed him the pistol after they were in the store. After Persons had placed several items on the store counter as if he wished to purchase them, appellant told Persons to point the gun at the store attendant and tell him he was being held up and to lie down on the floor. Appellant and Persons then went to the counter together, and Persons pointed his gun at the deceased and told him he was being held up and to lie on the floor. After the deceased did so, appellant opened the cash register and removed some money. The appellant then squatted over the deceased, pulled out the knife and raised it over his head, and began stabbing the deceased in the back with all his force. Just before appellant stabbed the deceased the last time, the deceased groaned and said, "that's enough." Persons looked at the deceased and saw that blood was gushing from his mouth onto the floor. Persons and appellant then left, and on the way out of the store appellant took a package of cookies. After appellant, McGuinn and Persons returned to the apartment, appellant and Persons left again in McGuinn's car and went to a house on Patton Street where the girl whom appellant had been dating lived and where appellant had been staying. As they were sitting in the car,

which was parked on the street, they saw a police patrol vehicle approach. Appellant, who was in the driver's seat, started the car, drove approximately two blocks without any lights, and turned around. Proceeding in the opposite direction they again saw the patrol vehicle approaching them, at which time appellant turned on the car lights. The police vehicle then followed them to the apartment, where subsequently they were arrested.

Robbins, in whose name the apartment was leased, testified that on the day of the offense appellant asked him if he were interested in "robbing some stores" and showed Robbins the pistol. He testified that he was present with appellant, McGuinn, Persons and Louis Ferguson when appellant spoke to them about "robbing a store" and threatened to kill them if they went to the police. He said he knew that appellant, McGuinn and Persons planned to commit a robbery when they left. He attempted to siphon fuel out of his van to put in McGuinn's car. When they returned, he saw blood on appellant's hands and on a knife he was carrying. Appellant gave $2 each to him, McGuinn and Louis Ferguson, and he assumed the money had been taken in a robbery. After appellant and Persons left again, the other three bought food with the money appellant had given them and then went to sleep.

Louis Ferguson, appellant's older brother, testified to substantially the same facts as did Robbins. He also testified that he loaned the knife which was used to kill the deceased to Jody Persons. When appellant and Persons returned at 3:30 a. m. the next day, appellant opened the door of the apartment and threw in the knife, hitting his brother in the mouth.

Lisa Pruitt and Chip Turner, acquaintances of appellant, both testified that they spoke with appellant on the day of the robbery, and he told them he was planning to "rob several stores." He also asked Turner to accompany him and told him how to kill with a knife by twisting it after stabbing.

Sherry Marion testified that she was speaking with the deceased on the telephone shortly before midnight on the night of the offense. Suddenly the deceased stopped talking; shortly thereafter, Marion heard the deceased scream and the sound of cracking metal, and then she heard the cash register open. She heard the deceased scream again, and after a period of silence the deceased came to the phone. He was "crying and choking and coughing real bad" and pleaded with Marion to call the police. She then hung up to do so.

Appellant's first contention concerns venireman Forrest Andrews. Andrews was assigned number 76 on the list of prospective jurors. When he failed to appear for voir dire examination at the proper time, the court instructed the district clerk to attempt to locate him, but she was unable to do so. The clerk then testified that Andrews did not personally contact her regarding his absence, but that she had called his place of employment and had been advised that he had left the state to attend his father-in-law's funeral and would be gone for several days. Appellant objected to continuing with voir dire until Andrews was present; the court overruled the objection and called the next venire member.

Andrews subsequently appeared in court over a week later, after venire member number 215 had been examined. Appellant objected to taking the venire member out of order, and the court sustained the objection. The court then questioned Andrews concerning his failure to appear, and he testified that he had been out of the state to attend his father-in-law's funeral and had forgotten that he was supposed to appear in court the previous week.

 Appellant urges that the court erred in continuing with the voir dire examination after Andrews failed to appear when his number was called. Art. 35.20, V.A.C.C.P., provides as follows:

"In selecting the jury from the persons summoned, the names of such persons shall be called in the order in which they appear upon the list furnished the defendant. Each juror shall be tried and

passed upon separately. A person who has been summoned, but who is not present, may, upon his appearance before the jury is completed, be tried as to his qualifications and impaneled as a juror, unless challenged, but *no cause shall be unreasonably delayed on account of such absence.*" (Emphasis added.)

It is clear that the statute does not require that voir dire be postponed whenever a prospective juror is not present at the time his name is called. See *Barnett v. State*, 76 Tex.Cr.R. 555, 176 S.W. 580 (1915); *Giesecke v. State*, 64 Tex.Cr.R. 531, 142 S.W. 1179 (1912); *Sinclair v. State*, 35 Tex.Cr.R. 130, 32 S.W. 531 (Tex.Cr.App.1895). The court did not err in continuing with voir dire after Andrews failed to timely appear in court.

After appellant had been arrested, a sample of his blood was taken while he was in custody. Appellant's motion to suppress this blood sample and the results of tests conducted on it was overruled. Those tests established, and it was revealed to the jury, that the blood on the knife, jacket, cuff and pants was not of the same type as that of appellant.

John Carlson, an officer of the Killeen Police Department, testified at the hearing on the motion to suppress that he accompanied appellant to the House Medical Clinic on January 28, 1977, when a sample of his blood was taken. Carlson testified that when he went to take appellant from his cell, "I told him that we were going to draw some blood from him for comparison and asked him if he objected to this and he said no." At the time, appellant had been incarcerated for approximately fifty-two hours and had not consulted with an attorney. Appellant had been advised of his right to counsel, and a telephone and telephone book were available to appellant had he desired to call an attorney. Carlson testified that appellant did not make a request to him for counsel, but he did not know whether appellant had made such a request to other officers.

The State argues that appellant has not properly preserved error, if any, regarding the taking of his blood sample because his objection at the time of trial is not the same as that urged on appeal. See *Bouchillon v. State*, 540 S.W.2d 319 (Tex.Cr.App.1976); *Taylor v. State*, 508 S.W.2d 393 (Tex.Cr. App.1974). Although there is considerable merit in the State's position, we shall nonetheless address the constitutional issue raised by appellant on appeal.

■ The taking of a defendant's blood is a search and seizure under Art. I, Sec. 9 of the Texas Constitution. *Escamilla v. State*, 556 S.W.2d 796 (Tex.Cr.App.1977); *Smith v. State*, 557 S.W.2d 299 (Tex.Cr.App. 1977). If the defendant is in custody, either a warrant must be obtained or the defendant must consent to the taking of his blood. *Smith v. State*, supra. In any case in which consent is in issue, the burden is upon the State to show the consent was freely and voluntarily given. *Bumper v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); *Smith v. State*, supra; *Escamilla v. State*, supra; *Evans v. State*, 530 S.W.2d 932 (Tex.Cr.App.1975). The prosecution must show the consent given was positive and unequivocal, and there must not be duress or coercion, actual or implied. *Evans v. State*, supra; *Allen v. State*, 487 S.W.2d 120 (Tex.Cr.App.1972). The burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority. *Bumper v. North Carolina*, supra; *Smith v. State*, supra; *Escamilla v. State*, supra; *Evans v. State*, supra. Given the totality of the circumstances in this case, including Carlson's testimony and the fact that appellant was only seventeen years old at the time, we are reluctant to say the State affirmatively established that appellant freely and voluntarily consented to the search of his body and seizure of his blood.

■ Even were we to hold that the State had not met its burden of showing consent, however, the admission in evidence of the blood sample would not require that the judgment be reversed. This evidence established only that the blood on the knife and on appellant's clothes was not that of appellant. It was shown that the blood on the knife and clothes was of the same type as

that of the deceased. There is no indication in the record that appellant had been bleeding or that the blood on the knife and clothes could have been his. Two accomplice witnesses, one of whom was an eyewitness to the offense, testified positively and unequivocally to appellant's guilt. Other witnesses testified that appellant told them he planned to commit a robbery and possibly a murder, and that if he used a knife to commit murder, he would stab and then twist. The deceased's wounds were compatible with a knife being used in such a manner. Appellant was found in possession, shortly after the offense, of bloodstained money in an amount comparable to that taken from the store where the deceased worked. Given the wealth of evidence of appellant's guilt, we conclude that the admission in evidence of the blood sample was harmless error beyond a reasonable doubt. See *Smith v. State*, supra; *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

Appellant also urges that his clothes and the money which was taken from his wallet, both of which were bloodstained, should not have been admitted in evidence because they were the product of an unlawful search and seizure.

At approximately 5:00 p. m. on the day of the offense, Terry Barnett, an officer of the Copperas Cove Police Department, called Bell County Deputy Sheriff Danny Johnson on the telephone and advised him that an informer had stated that he had heard appellant and another person named Bob bragging about having committed a murder when they robbed a woman at a grocery store a few days earlier. The informer told Barnett that the two persons in question would probably be in a silver Dodge Charger in the vicinity of Patton Street in Killeen. Barnett testified at the hearing on appellant's motion to suppress that he had known the informer, whom he named, for more than a year; that the informer had no criminal record; and that the informer's reputation for truthfulness and for being a peaceful and law-abiding citizen was good.

Barnett also testified that the informer had given him information in the past concerning narcotics; Barnett did not know whether the information which the informer previously had given him was true or whether any arrests had been made.

Deputy Johnson testified that after talking with Barnett he relayed the information he had received to Deputy Burt Wilkerson of the Harker Heights Police Department, who was investigating the murder which had occurred several days previously. After he talked with Wilkerson, Johnson drove around in the vicinity of Patton Street looking for the car in question. Shortly after midnight the next morning Johnson was summoned to the Killeen Police Department to assist in the investigation of the murder for which appellant was convicted. Johnson then related the information which he had received to Captain Dennis Lewis of the Killeen Police Department. On the way home after that conversation, Johnson again drove by the house on Patton Street, where he saw a silver and black Dodge Charger parked by the curb. After he passed the car, Johnson turned his patrol vehicle around and again drove down Patton Street, at which time he noticed the car no longer was parked where it had been. He then saw a pair of headlights come on on an oncoming car; when the car passed his, Johnson noticed that it was the Dodge Charger which had been parked on the street. Johnson again turned his vehicle around and attempted to pursue the car, but lost sight of it. Johnson then made a call on his police radio to request assistance in locating the vehicle, which he reported was being driven without headlights; he subsequently received a call from the radio dispatcher advising him that the car in question was being followed by a police vehicle on Highway 190. Johnson went to the duplex on Avenue J where the car had stopped and saw Joe Brennan, an officer of the Killeen Police Department, speaking with the driver of the car. Johnson approached the car to ask the passenger for identification and saw a long silver knife on the dashboard and the butt of a pistol stick-

ing from beneath the seat on the floorboard of the car. The driver of the car, who was identified as appellant, then went into the duplex to summon the owner of the car. Other police officers arrived very shortly, and one of them, Officer Lewis, asked Brennan if appellant had a driver's license; when Brennan replied that he did not, Lewis arrested appellant.

Officer Brennan testified that after hearing a radio report that a black and silver Dodge Charger was being sought for driving without headlights he saw such a car being driven very slowly. He followed the car to the duplex on Avenue J and parked behind it. Brennan called to appellant and Persons as they were walking to the doorway of the apartment and said, "Would you mind coming back over and talking with me?" When appellant and Persons complied with Brennan's request, he asked them for identification; appellant replied that he did not have any identification.

 Appellant insists that the blood-stained clothing and money seized during the search of his person should not have been admitted in evidence because that search was incident to an unlawful arrest. We do not agree. The record does not reflect that Brennan initially did anything more than stop appellant to investigate and inquire about possible criminal behavior, i.e., driving without headlights. See *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Milton v. State*, 549 S.W.2d 190 (Tex.Cr.App.1977); *Crawford v. State*, 544 S.W.2d 163 (Tex.Cr.App.1976).

Circumstances falling short of probable cause for an arrest may justify temporary detention for purposes of investigation, since an investigation is considered to be a lesser intrusion upon the personal security of an individual than is an arrest. See *Ablon v. State*, 537 S.W.2d 267 (Tex.Cr.App. 1976); *Milton v. State*, supra; *Crawford v. State*, supra. To justify an investigative stop, an officer, in light of his experience and general knowledge, must point to specific and articulable facts which, taken together with rational inferences from those facts, warrant the intrusion on the person stopped for further investigation. *Terry v. Ohio*, supra. See also *Milton v. State*, supra. A police radio call may provide sufficient basis for an investigative stop, *Ablon v. State*, supra, as may an anonymous telephone call, *Mann v. State*, 525 S.W.2d 174 (Tex.Cr.App.1975). Once Brennan had initiated the investigation and it was revealed that appellant did not have a driver's license, probable cause existed for his arrest for driving without a license. Art. 6701d, Sec. 153, V.A.C.S.; Art. 14.01(b), V.A.C.P.; see *Smith v. State*, 456 S.W.2d 90 (Tex.Cr.App.1970); *Myricks v. United States*, 370 F.2d 901 (5th Cir. 1967), cert. denied, 386 U.S. 1015, 87 S.Ct. 1366, 18 L.Ed.2d 474.

Appellant relies on *Hooper v. State*, 533 S.W.2d 762 (Tex.Cr.App.1976) and *Fatemi v. State*, 558 S.W.2d 463 (Tex.Cr.App.1977) for the proposition that his person was searched as the result of a pretext arrest. Those cases are clearly distinguishable from the case at bar. In *Hooper*, the defendant was arrested ostensibly for defective brake lights. The State offered no evidence that the brake lights of the defendant's truck were defective, and this Court held that the State had not refuted the prima facie case of a pretext arrest which the defendant had made out. In *Fatemi* we held that a temporary detention of the defendant's automobile ostensibly for a driver's license check could not be upheld where the actual purpose of the detention was to further the officer's investigation for an unrelated offense. In the instant case, Brennan possessed specific and articulable facts which afforded the basis for his initial detention of appellant. It is uncontroverted that appellant was driving without a driver's license, and Lewis therefore was justified in arresting appellant.

Appellant urges that the court should have instructed the jury that Robbins and Louis Ferguson were accomplice witnesses as a matter of law. In the alternative, he contends that the court erred in refusing to submit to the jury the question of whether

Robbins and Louis Ferguson were accomplice witnesses. Appellant argues that Robbins was an accomplice witness because: (1) he allowed his apartment to be used to plan the offense and for appellant to clean himself and the murder weapon after the offense was committed; (2) he obtained or attempted to obtain gasoline which was used in the automobile in which appellant and his accomplices rode before and after the offense; (3) he helped appellant obtain the pistol which was exhibited during the commission of the offense; and (4) he received money from appellant which he knew was taken in a robbery and used it to buy food. Appellant argues that Louis Ferguson was an accomplice witness because: (1) he furnished the murder weapon and hid it after the commission of the offense; (2) he furnished a jacket which Persons wore during the robbery; (3) he at one time agreed to participate in the commission of the offense; and (4) he, too, received and spent money which he knew was obtained during a robbery.

The record does not bear out all of appellant's assertions concerning the actions of Robbins and Louis Ferguson. The only evidence that Robbins helped appellant obtain a gun is Robbins' statement that he told a third party known as "Wild Bill Cody" that appellant might want to purchase a gun. Robbins testified that he did not tell appellant that this person had a gun for sale and that he did not know whether appellant in fact bought a gun from Wild Bill Cody. Robbins testified that he attempted to siphon fuel from his van into McGuinn's car, and was able to secure "a couple of drops." The record does not show, however, that appellant or his accomplices requested that Robbins provide them with fuel for their criminal activities. Robbins had driven McGuinn's car earlier on the night of the offense, and to repay McGuinn for the fuel he had used, he bought some gas and attempted to siphon more from his van. Likewise, the record does not show that Louis Ferguson furnished the murder weapon to appellant. Both Robbins and Louis Ferguson testified that Jody Persons borrowed the knife from Louis Ferguson on the afternoon of the offense to clean his fingernails and did not return it. Louis Ferguson also denied that he hid the murder weapon, which was found under a pillow in the apartment. He testified that when appellant came to the door of the apartment on the morning after the offense, just before he was arrested, he threw the knife into the apartment hitting him (Louis Ferguson) in the mouth. The appellant's brother testified that he picked up a pillow and wiped his mouth with it to determine if he were bleeding, and then placed the pillow down. Nobody testified that Louis Ferguson intentionally hid the murder weapon. Louis Ferguson testified that he lent Persons the jacket that he wore on the night of the offense, but we cannot say that by so doing he aided in the commission of the offense of capital murder.

▮▮▮ An accomplice witness is someone who has participated with another before, during or after the commission of a crime. *Jackson v. State*, 552 S.W.2d 798 (Tex.Cr.App.1977); *Singletary v. State*, 509 S.W.2d 572 (Tex.Cr.App.1974). One is not an accomplice witness who cannot be prosecuted for the offense with which the accused is charged. *Easter v. State*, 536 S.W.2d 223 (Tex.Cr.App.1976); *Morgan v. State*, 171 Tex.Cr.R. 187, 346 S.W.2d 116 (1961); *Silba v. State*, 161 Tex.Cr.R. 135, 275 S.W.2d 108 (1954); *Liegois v. State*, 73 Tex.Cr.R. 142, 164 S.W. 382 (1914). A witness is not deemed an accomplice witness because he knew of the crime but failed to disclose it or even concealed it. *Easter v. State*, supra; *Gausman v. State*, 478 S.W.2d 458 (Tex.Cr.App.1972).

▮▮▮ Appellant has cited a number of cases which hold that a witness who receives stolen property, knowing it to be stolen, is an accomplice witness as a matter of law. See *Kirkendoll v. State*, 132 Tex.Cr.R. 104, 102 S.W.2d 214 (1937); *Stephenson v. State*, 152 Tex.Cr.R. 624, 216 S.W.2d 586 (1949); *Odom v. State*, 438 S.W.2d 912 (Tex.Cr.App.1969); *Ysasaga v. State*, 444 S.W.2d 305 (Tex.Cr.App.1969); *Anders v. State*, 501 S.W.2d 665 (Tex.Cr.App.1973).

*Kirkendoll* and *Stephenson* involved prosecutions for robbery, *Odom* was a prosecution for being an accomplice to a robbery, and *Ysasaga* and *Anders* involved prosecutions for burglary. These cases were all convictions under the former penal code. The facts of the instant case are more similar to those of *Ballard v. State*, 519 S.W.2d 426 (Tex.Cr.App.1975), also a conviction under the former penal code. There, the accused was convicted for a murder in the course of which several items of property were taken from the deceased's home. This Court held that a witness who received an item of the stolen property, knowing it to be stolen, was not an accomplice witness to the offense of murder:

> "We are not presented here with the question of whether Dempsey would be an accomplice witness in the trial of the appellant for acquiring the diamond ring by committing the offense of robbery or theft. The question is whether Dempsey was an accomplice witness in the appellant's trial for murder. Since there is no evidence to show that Dempsey was an accomplice, principal, or accessory to the murder of Currie, he is not an accomplice witness in the trial of the appellant for the murder of Currie. See *Ham v. State*, 4 Tex.App. 645 (1878); *Warren v. State*, 60 Tex.Cr.R. 468, 132 S.W. 136 (1910); *Liegois v. State,* 73 Tex.Cr.R. 142, 164 S.W. 382 (1914); *Chandler v. State*, 89 Tex.Cr.R. 599, 232 S.W. 337 (1921); *Carnathan v. State*, 478 S.W.2d 490 (Tex.Cr. App.1972); 23 C.J.S. Criminal Law § 786(2). Cf. *Washburn v. State*, 167 Tex.Cr.R. 125, 318 S.W.2d 627 (1958); *Morgan v. State*, 171 Tex.Cr.R. 187, 346 S.W.2d 116 (1961)."

The court did not err in refusing to charge that Robbins and Louis Ferguson were accomplices as a matter of law or to submit that issue to the jury. *Ballard v. State*, supra, and authorities cited therein. See also *Jackson v. State*, supra; *Singletary v. State*, supra; *Hunt v. State*, 492 S.W.2d 540 (Tex.Cr.App.1973); *Silba v. State*, supra.

■ Appellant acknowledges that he is well award that a charge on circumstantial evidence is not required when the only direct evidence is the testimony of an accomplice witness. *Gutierrez v. State*, 423 S.W.2d 593 (Tex.Cr.App.1968); *White v. State*, 385 S.W.2d 397 (Tex.Cr.App.1964). He urges, nonetheless, that the refusal of his requested charge on circumstantial evidence constituted reversible error in the instant case because "if the jury did, in fact, disregard the testimony of the accomplice witness if they felt it was not true or had not been corroborated, then their verdict was based on circumstantial evidence."

This Court charged as follows on accomplice witnesses and the necessity for corroboration of their testimony:

> "You are instructed that a conviction cannot be had upon the testimony of an accomplice unless the jury first believes that the accomplice's testimony is true and that it shows the defendant guilty of the offense charged against him, and even then you cannot convict unless the accomplice's testimony is corroborated by other evidence tending to connect the defendant with the offense charged, and the corroboration is not sufficient if it merely shows the commission of the offense, but it must tend to connect the defendant with its commission."

The charge required the jury to find, in order to convict appellant, both that the accomplice witness' testimony was true and that it was sufficiently corroborated. The jury, as evidenced by the verdict of guilt, obviously made both these findings. Since the charge did not allow the jury to convict without believing the accomplice witness' testimony, there was no necessity to charge on the circumstantial nature of the nonaccomplice incriminating evidence. The court did not err in refusing to submit appellant's requested charge on circumstantial evidence.

■ Appellant's final contention is that the court erred in overruling his motion for a mistrial when the prosecutor made a sidebar remark during his examination of the accomplice witness McGuinn. The following colloquy occurred as McGuinn was being questioned about his observations of the deceased after he was stabbed:

"Q. Okay. Could you see him through that window all right when you were sitting in the car?

"A. I just glanced at him, Sir, whenever I was backing away.

"Q. Was he on the phone?

"A. Yes Sir he was.

"Q. Did you notice anything about his mouth or nose unusual?

"A. He had something covering, I believe it was the right hand side of his face, Sir.

"Q. Could you tell what it was?

"A. No, Sir, I couldn't.

"Q. Did you have an idea?

"[DEFENSE COUNSEL]: Your Honor, I would object to this, he has answered the question.

"THE COURT: Sustained.

"Q. Just trying to get the truth. Where did you drive—

"[DEFENSE COUNSEL]: Your Honor, I'm trying to object.

"[COUNSEL FOR THE STATE]: Excuse me, I didn't even hear the objection.

"[DEFENSE COUNSEL]: We object to Mr. Eads' sidebar remarks and request that he be instructed not to make such remarks and the jury be instructed to disregard it.

"THE COURT: I sustain and ask counsel not to comment on the questions and answers and ask the jury to disregard his comment he just made."

Appellant's motion for a mistrial was overruled.

Appellant argues that the prosecutor's remark was meant to imply that appellant's counsel wished to prevent the jury from learning the truth. The cases cited by appellant in which the judgments were reversed because the prosecutor argued that defense counsel was trying to hide the truth from the jury involved statements measurably more blatant than that involved here. See *Lewis v. State*, 529 S.W.2d 533 (Tex.Cr. App.1975); *Lopez v. State*, 500 S.W.2d 844 (Tex.Cr.App.1973). We construe the prosecutor's remark, rather than being an attack on appellant's counsel, as an attempt to elicit a responsive answer from the witness. Apparently the trial court, which instructed the prosecutor "not to comment on the questions and answers," construed this remark in the same way. The cautious trial court's instruction protected the appellant's rights. See *Stein v. State*, 514 S.W.2d 927 (Tex.Cr.App.1974); *Barnes v. State*, 502 S.W.2d 738 (Tex.Cr.App.1973).

 The death penalty is a harsh penalty; it is especially harsh when assessed against a person who is seventeen years of age as was the appellant when he committed the offense. However, in view of the savage, ruthless murder for which appellant was convicted and in view of the entire record, we cannot say that the death penalty assessed is unjust.

The judgment is affirmed.

VOLLERS, J., not participating.