**William Evans HORNE, Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**No. 63221.**

Court of Criminal Appeals of Texas, En Banc.

Nov. 12, 1980.

J. R. Musslewhite, Houston, on appeal only, for appellant.

John B. Holmes, Jr., Dist. Atty., Calvin A. Hartmann and Dennis Cain, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

CLINTON, Judge.

This is an appeal from conviction for capital murder and, the jury having answered the issues affirmatively, the death penalty.

### I.

The essence of the State's evidence comes from two witnesses.

On November 21, 1977, Linda Tomlinson was working at a pharmacy when at about 11:30 a. m. Horne and another man, later identified as Allen Cummings, entered and asked to look at some turquoise jewelry. Horne took a bracelet, put it in his pocket

and pulled out a gun. Cummings grabbed Tomlinson and told her to stand still and "nobody would get hurt." Horne then walked around the counter into the back room where the deceased, Don Hatchell, the pharmacist, was working. Tomlinson then heard several shots. Cummings let go of her and ran out the door. She then saw Horne crawl out from behind the counter toward the door. She later found Hatchell lying dead in the back room.

Michael Brock testified that he, Horne, Cummings and Cummings' brother David went to a bar on the morning of November 21, 1977 and discussed acquiring drugs by robbery. Brock then drove the three men to the pharmacy. Allen Cummings and Horne went into the store. Brock stated that he saw the gun in Horne's hand but that Horne stuck it somewhere when he went into the pharmacy. Brock then heard gunshots. Allen Cummings ran out of the pharmacy yelling that Horne had been shot. Horne came out and fell down in front of the store. The Cummings brothers picked him up, put him in the car and took him to the hospital.

Through investigating officers it was established on cross examination that a bracelet such as that described by Tomlinson was not found at or around the crime scene or in the jacket or among personal effects of appellant inventoried by them at the hospital.

Appellant presented Allen Cummings and himself.

Horne testified that the four never discussed robbing the pharmacist. Their sole intent was to "bust some prescriptions," i. e., to write a prescription on a stolen prescription pad by forging a doctor's signature and handwriting. Horne testified that although he took the gun into the pharmacy

he did not pull it out of his pocket when he was talking to Tomlinson, nor did he put any jewelry in his pocket. He stated that he approached Hatchell to ask about filling prescriptions.[1] Hatchell was talking on the phone when Horne went into the back room. Hatchell turned around, saw Horne, pulled out a gun and shot Horne twice.[2] Horne stated that he then pulled the gun out of his pocket and shot. Horne said that he did not aim the gun and that he fired the gun to prevent Hatchell from killing him. Hatchell then shot him a third time in the groin. Horne crawled out the door and made his escape.

Allen Cummings also testified that the four men never discussed robbing the place but, instead, talked about passing a forged prescription. Cummings also stated that he never saw Horne pull out a gun, either in front of Mrs. Tomlinson or on his way to the back room. He stated that he never told Tomlinson to stand still. He further denied planning to steal or stealing any jewelry.

Horne argues that the trial court erred in overruling his objection to the charge because it contained no instruction on self-defense. We must agree.

 *Rodriquez v. State,* 544 S.W.2d 382 (Tex.Cr.App.1976), *Warren v. State,* 565 S.W.2d 931 (Tex.Cr.App.1978) and *Randle v. State,* 565 S.W.2d 927 (Tex.Cr.App.1978) apply the long-settled rule that was well stated in *Gavia v. State,* 488 S.W.2d 420, 421 (Tex.Cr.App.1972):

"In determining whether any defensive charge should be given, the credibility of evidence or whether it is controverted or conflicts with other evidence in the case may not be considered. When a defensive theory is raised by evidence from any source and a charge is properly requested, it must be submitted to the jury. It is

---

1. Cummings testified that the pharmacy had previously filled both legal and illegal prescriptions for him and it was his own idea that the foursome go to that particular pharmacy on this occasion. While appellant stated that in speaking to the pharmacist he did not intend to imply that the prescription was "fake," he did attempt to create the impression that the pharmacist would have filled it anyway.

2. According to a deputy sheriff who examined the crime scene, a revolver was found under the knee area of the right leg of the deceased. The weapon contained five fired cases, and one cylinder was empty.

then the jurors' duty, under the proper instructions, to determine whether the evidence is credible and supports the defense."

The testimony of appellant and Allen Cummings, even though disputed, raises the issue of self–defense, and the injury, harm and damage that the State fails to perceive flow from denial of the right to have his legal defense determined by the jury rather than the trial court.[3] *Warren v. State,* and *Randle v. State, supra,* and cases cited therein; *Rodriquez v. State, supra; cf. Sutton v. State,* 548 S.W.2d 697, 699 (Tex.Cr. App.1977).

Accordingly, we hold that the trial court committed reversible error in refusing the submission of the issue of self–defense to the jury for a fact finding, upon appellant's timely request therefor. Thus, the judgment of conviction must be reversed.

## II.

In determining that the Texas capital murder procedure is constitutionally viable

on its face, a majority of the Supreme Court of the United States predicated that conclusion upon two factors: first, that the special statutory issues[4] submitted to the jury at punishment, give that fact finding body adequate guidance enabling constitutional performance of its sentencing function; and, in the words of the Court, secondly,

> By providing prompt judicial review of the jury's decision in a court with state–wide jurisdiction, Texas has provided a means to promote the even–handed, rational, and consistent imposition of death sentences under law. *Because this system serves to assure that sentences of death will not be 'wantonly' or 'freakishly' imposed, it does not violate the Constitution.* *Furman v. Georgia,* 408 U.S. at 310, 92 S.Ct. at 2762 (Stewart, J., Concurring). Accordingly, the judgment of the Texas Court of Criminal Appeals is affirmed.[5]

*Jurek v. Texas,* 428 U.S. 262, 276–277, 96 S.Ct. 2950, 2958, 49 L.Ed.2d 929 (1976).

---

**3.** In *Liskosski v. State,* 23 Tex.App. 165, 3 S.W. 696, 698 (1886) is written:

> ". . . The charge of the court must make a pertinent application of the law covering every theory arising out of the evidence; that duty is not dependent upon the court's judgment of the strength or weakness of the testimony supporting the theory, it being the prerogative of the jury to pass upon the probative force of the testimony."

The State, assuming arguendo the issue of self–defense was raised, contends, nevertheless, that the jury exercised its prerogative at the punishment stage by finding that the conduct of appellant in killing the pharmacist "was unreasonable in response to the provocation, if any, by the deceased." The contention is without merit for the third special issue simply does not embrace the critical elements of self–defense set out in V.T.C.A. Penal Code, §§ 9.31 and 9.32. As one instance, we note that the focus of the third question is on an objectively determined reasonableness of response, see *Duffy v. State,* 567 S.W.2d 197, 209 (Tex.Cr. App.1978), whereas self–defense depends more on the subjective viewpoint of the accused, e. g., *Jones v. State,* 544 S.W.2d 139, 142 (Tex.Cr. App.1976). While it may be true that a jury properly charged on the merits will more than likely answer this issue against the accused, see Black. "Due Process for Death," 26 Catholic U.L.R. 1 at 3, an affirmative response may not serve as a rejection of a claim of self–de-

fense that was never put to the jury for determination in the main charge of the court.

**4.** Article 37.071 provides in pertinent part:

> \* \* \* \* \* \*
>
> (b) On conclusion of the presentation of the evidence, the court shall submit the following issues to the jury:
>
> (1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;
>
> (2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and
>
> (3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.

By separate grounds of error our appellant challenges sufficiency of the evidence to support the jury's affirmative answers to the second and third issues, respectively. For reasons stated in Part II of this opinion, I am persuaded that appellant is correct as to the second issue and, therefore, do not reach the third one.

**5.** All emphasis is supplied throughout by the writer of this opinion unless otherwise indicated.

Thus, recognizing our responsibility in assuring the evenhanded application of the ultimate punishment, I turn to consideration of the evidence supporting the assessment of the death penalty, and factors extant in mitigation thereof. *Id.*; see also *Vigneault v. State*, 600 S.W.2d 318 (Tex.Cr.App.1980); *Ferguson v. State*, 573 S.W.2d 516 (Tex.Cr.App.1979); *Villarreal v. State*, 576 S.W.2d 51 (Tex.Cr.App.1978); *Bodde v. State*, 568 S.W.2d 344 (Tex.Cr.App.1978); *Duffy v. State*, 567 S.W.2d 197 (Tex.Cr.App.1978).

The State's evidence adduced at the punishment phase of trial consisted of the testimony of a sole witness: Jim Lowe, an eighteen year old "licensed minister out of Lakewood International."

According to Lowe, who testified he worked part-time at Maxey Pharmacy, was a student at Houston Baptist University and was "presently engaged in the ministry," he knew appellant's reputation for being a peaceful and law abiding citizen was bad. This knowledge was gleaned from "a girl named Debbie" who had "gotten" some unidentified drugs from appellant, the witness believed, "about a year ago." The witness claimed that his main contacts in his ministry were "street people" and that he had seen appellant once, but did not remember when or where. After this testimony, the State rested.

Appellant again took the stand in his own behalf. Appellant admitted that he had in the past given or sold marihuana to others, but denied he had done so in the preceding three years; he further denied that he had ever sold heroin, "pills" or any other hard drug.

The record establishes that appellant had never before been convicted of any felony or misdemeanor offense and in fact, had no police record at all. Appellant testified that the instant offense was the only "act of violence [he had] ever committed."

Appellant also detailed his employment record starting when he was sixteen years old. Part of that record consisted of his more than four year tour of duty with the United States Navy in which he was enlisted as an "Airman Apprentice I, Aviation." He served an eight month tour on an aircraft carrier which took him to the coast off Viet Nam. After his apparently honorable discharge from the Navy at the rank of E–3 in 1975, appellant worked with a contractor building houses, then returned to the merchant marines, his occupation prior to entry into the Navy. At the time of commission of the instant offense, appellant had been back in Houston after a voyage, for less than two weeks. He was making approximately $1200.00 per month and had money saved.

The evidence indicates that at the time of the offense, the 23 year old appellant had been "partying" with the Cummings brothers for several days in celebration of his return home. Appellant and Allen Cummings had, on the morning of the offense, ingested the last of the latter's "quaaludes," a powerful hypnotic drug, the effect of which is exacerbated by alcohol. Later, they drank beer and "shots" of "Wild Turkey."

The night before, while appellant and the Cummings brothers were away from their apartment to pick up dates, the apartment was burglarized. Upon their return, and this discovery, David Cummings borrowed the pistol which would fatally wound the deceased the next day. Allen Cummings admitted his theft and possession of a prescription pad from his doctor's office, and conceded that it was his idea to go into the pharmacy and "bust" prescriptions on the day of the offense. Cummings testified that he had never known appellant to carry a firearm, or to own one. Appellant testified that he did not own such a weapon.

According to appellant and Allen Cummings, they set out the morning of the offense with David Cummings, to confront the person suspected of burglarizing the apartment the preceding night. As they got into Michael Brocks' car, David asked whether someone had gotten the pistol and appellant said, "Well, just a minute" and ran back in for it. Appellant put the pistol in his back pocket before he went outside to the car "so it wouldn't be brandished out

... in the parking lot." They then went to a bar the person they sought "frequented." As they were about to go in, David asked appellant if he "had that gun," and, because it is illegal to carry a pistol into a bar, appellant stuck it in the seat. When they got back into the car, concern for the display of the weapon on the seat prompted appellant to put it back in his pocket.

Appellant claimed that he did not pull the pistol out until he had been shot twice by Hatchell, and then he fired it without aiming, after which, Hatchell shot him again, hitting him in the groin. While the testimony as to who pulled a pistol first was disputed, Linda Tomlinson never asserted that she witnessed the movements, words or gestures of the parties involved in the actual shooting. While there is no question that appellant possessed the gun and fired it, [see n. 3, *ante*], it is important to note—particularly in considering the issues involved at punishment—that there was no testimony from anyone, save appellant, as to how the altercation began and progressed.

Thus, in addition to the aggravating feature found extant by the jury in the verdict of guilt—that the murder occurred in the course of a robbery, see *Jurek v. Texas, supra*,—the only evidence reflected by this record which would arguably tend to support an affirmative finding on the second special issue [see n. 4, *ante*], and the resultant assessment of the death penalty, is the facts of the offense itself and appellant's admission that he had in the past sold marihuana.

I am unable to conclude that an admitted, unadjudicated past history of "giving and selling" marihuana, is probative of whether an individual will commit "criminal acts of violence that would constitute a continuing threat to society."[6] This is particularly so when viewed in light of other evidence establishing that appellant had no criminal record of either arrests, allegations or convictions, whatever.

In *Brooks v. State*, 599 S.W.2d 312, 323 (Tex.Cr.App.1980), we stated:

"The circumstances of the offense itself can sustain a 'yes' answer if they are severe enough, *Burns v. State*, 556 S.W.2d 270 (Tex.Cr.App.1977); ... *Muniz v. State*, 573 S.W.2d 792 (Tex.Cr.App. 1978), or can fail to support it if they are not and are unsupplemented by other evidence, *Warren v. State*, 562 S.W.2d 474 (Tex.Cr.App.1978); *Muniz v. State, supra*.

The circumstances of the offense presented here are in marked contrast to those adduced in *Burns v. State, supra*, as well as in *Muniz v. State, supra*. The latter cases chronicle crimes of the most shocking nature, evincing that most dangerous aberration of character conceivable.

In *Warren v. State, supra*, a majority of the Court concluded at 477,

"While there may be cases where the evidence offered at the guilt stage of the trial may be sufficient to support an affirmative finding to special issue No. 2 under Article 37.071, we conclude under the circumstances of the instant case that the evidence is insufficient...."

This language was recently quoted and applied in *Brasfield v. State*, 600 S.W.2d 288 (Tex.Cr.App.1980). See also *Cortez v. State*, 571 S.W.2d 308 (Tex.Cr.App.1978).[7] I

---

**6.** The United States Court of Appeals for the Fifth Circuit, in passing on the proportionality of punishment to the offense of sale of heroin under the Eighth Amendment's prohibition against cruel and unusual punishment, recently noted,

"... [T]he State argues that we should take cognizance of the fact that drug abuse is a matter of grave concern to our society, a problem that engenders concomitant criminal activity. * * *

The State has again missed the point of the proportionality doctrine in arguing that in each and every case of drug distribution we

must consider the *societal harm caused by drug trafficking as a whole without regard to the [degree of danger presented by the] facts of the particular case under review*." *Terrebonne v. Blackburn*, 624 F.2d 1363 (5th Cir. 1980)

**7.** On determining that the admission of two Florida convictions at the punishment phase constituted error the Court proceeded to a consideration of whether that admission was harmless. It was concluded at 312,

"Considering the facts of the primary offense and the nature of appellant's prior [criminal]

believe that the facts of the instant case fall somewhere between those proffered in *Warren v. State, supra,* and *Brasfield v. State*; as such, I am constrained to find that they are short of sufficient.

Viewed as a whole, the record presents a picture of a twenty–three year old man, who had been regularly employed, served honorably in the military, exhibited no propensity toward violence, and perhaps through irresponsible use of a powerful drug and selection of companions, was involved in a single act of violence in which he sustained serious injury. Appellant's conduct which caused the death of the deceased here, appears to have been an aberration. There is no evidence of a probability that he will commit future acts of violence that constitute a continuing threat to society. The jury's affirmative finding in this regard is unsupported by the record.

This conclusion does not serve to palliate the participation in a transaction such as the one established by the record before us; rather, it is impelled by our statutory function to assure that *death sentences* are not wantonly or freakishly imposed.

I would hold that imposition of the death sentence under the facts and circumstances of this case would constitute a constitutionally forbidden capricious and arbitrary [8] application of that extreme penalty and we decline to do so. Cf. *Vigneault v. State, supra; Ferguson v. State, supra; Villarreal v. State, supra; Bodde v. State, supra;* and *Duffy v. State, supra.*

Under the authority of *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); and *Greene v. Massey,* 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978); and *Brasfield v. State, supra,* the State should be precluded from again seeking the death penalty against appellant, but a majority of the Court would permit it to do so in the event of a new trial.

The judgment of conviction is reversed and this cause is remanded to the trial court.

It is so ordered.

DOUGLAS, ODOM, TOM G. DAVIS, DALLY and W. C. DAVIS, join in Part I only.

ROBERTS, Judge, concurring.

I join in Part I of Judge Clinton's opinion, as do all the members of the court.

A majority of the court expressly have declined to join in Part II of that opinion. Part II expresses the views that (A) the evidence was insufficient to show "a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society" (as the issue is drawn in Article 37.071(b)(2) of the Texas Code of Criminal Procedure), and (B) the Double Jeopardy Clause of the Fifth Amendment prevents the State from seeking the death penalty at a retrial of this case. Although they do not say so, I take it that the majority must disagree with the view (A) that the evidence was insufficient rather than with view (B) of the Double Jeopardy Clause. The identical view of the Double Jeopardy Clause was adopted as the holding of the court in *Brasfield v. State,* 600 S.W.2d 288, 298 (Tex.Cr.App.1980), and no judge dissented. I did not participate in *Brasfield v. State,* so I take this occasion to express my view of insufficient evidence on special issue (2) of Article 37.071(b).

In *Brasfield v. State,* 600 S.W.2d 288, 298 (Tex.Cr.App.1980), the court drew its authority from *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978). There the Supreme Court remarked:

"The Double Jeopardy Clause forbids a second trial for the purpose of affording the prosecution another opportunity to

record, we cannot say that the erroneous admission of two prior convictions could not have affected the jury in their answers to the special issues . . . ."

Excluding the two convictions improperly admitted, Cortez' criminal record consisted of four prior convictions, "only one of which"–as-

sault with a deadly weapon–involved a crime of violence, and the facts of the capital murder established an otherwise unremarkable murder committed in the course of robbery.

8. See *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).

supply evidence which it failed to muster in the first proceeding. This is central to the objective of the prohibition against successive trials. The Clause does not allow 'the State ... to make repeated attempts to convict an individual for an alleged offense,' since 'the constitutional prohibition against " 'double jeopardy' " was designed to protect an individual from being subjected to the hazards of trial and possible conviction more than once for an alleged offense.' *Green v. United States*, 355 U.S. 184, 187, [78 S.Ct. 221, 223, 2 L.Ed.2d 199] (1957) ...."

437 U.S. at 12, 98 S.Ct. at 2147 (footnote omitted). The court went on to draw a distinction between trial error and insufficiency of evidence. It held that there could be a retrial after an appellate reversal for trial error, which implies nothing about the defendant's guilt, because both parties have an interest in readjudication. 437 U.S. at 15, 98 S.Ct. at 2149.

"The same cannot be said when a defendant's conviction has been overturned due to a failure of proof at trial, in which case the prosecution cannot complain of prejudice, for it has been given one fair opportunity to offer whatever proof it could assemble. * * *

* * * "Given the requirements for entry of a judgment of acquittal, the purposes of the Clause would be negated were we to afford the Government an opportunity for the proverbial 'second bite at the apple.' "

437 U.S. at 16–17, 98 S.Ct. at 2149–50 (footnote omitted).

Because there may be a retrial after a reversal for trial error, but not after a reversal for insufficiency of evidence, we have developed a procedural rule which is a natural corollary to *Burks*: Even though we have found reversible trial error we must still address a challenge to the sufficiency of the evidence, because such a ground would bar a retrial. *Rains v. State*, 604 S.W.2d 119 (Tex.Cr.App.1980); *Swabado v. State*, 597 S.W.2d 361 (Tex.Cr.App. 1980). Accord, e. g., *United States v. Meneses–Davila*, 580 F.2d 888, 896 (5th Cir. 1978).

In *Brasfield v. State*, 600 S.W.2d 288 (Tex.Cr.App.1980), the court applied this procedural rule to a ground that challenged the sufficiency of the evidence on special issue (2). (The court had already found reversible trial error in the failure to quash the indictment.) Part II of Judge Clinton's opinion today would apply this procedural rule again to a claim that the evidence was insufficient on special issue (2). I do not think that the rule is properly applicable to such a claim, for I do not think that relitigation of special issue (2) should be barred after a reversal for trial error. Once we have found reversible trial error in a death penalty case, we need not consider a claim that the evidence was insufficient on special issue (2).[1]

To begin with, it must be remembered that in a case like *Brasfield v. State*, 600 S.W.2d 288 (Tex.Cr.App.1980), there would be a remand for retrial because of the trial error, regardless of the evidence on special issue (2). The case would not be one like *Burks v. United States*, 437 U.S. 1, 98 S.Ct.

1. When there is no reversible trial error we should consider a claim that the evidence was insufficient on special issue (2). If the evidence were insufficient the judgment should be reformed to confinement for life (just as the trial court should have entered a directed verdict of *no* on the special issue) and affirmed. In *Evans v. State* (Tex.Cr.App. No. 60,016 Sept. 10, 1980) (Roberts, J., dissenting) I argued that this court had the authority and the duty to reform a judgment when only one verdict was available under the law. It is even more clear that such an action should be taken when the only error is insufficient evidence on special issue (2). The alternative of reversing

and remanding for an entirely new trial would not only be a pointless relitigation of a judgment of guilt that was free from error; it might also offend the prohibition against successive trials that is the objective of the Double Jeopardy Clause, *Burks v. United States*, 437 U.S. 1, 11, 98 S.Ct. 2141, 2147, 57 L.Ed.2d 1 (1978). *See generally Breed v. Jones*, 421 U.S. 519, 532–533, 95 S.Ct. 1779, 1787, 44 L.Ed.2d 346 (1975) (Part III–A). Such a case would be unlike *Brasfield v. State*, 600 S.W.2d 288 (Tex. Cr.App.1980), in that the retrial of such a case would be the result of insufficient evidence rather than trial error.

2141, 57 L.Ed.2d 1 (1978), in which insufficient evidence of guilt would bar a retrial altogether. If the "objective" of the Double Jeopardy Clause is "the prohibition against successive trials," 437 U.S. at 11, then the objective would not be achieved by prohibiting the State from relitigating special issue (2). Such a prohibition would only narrow the range of punishment.

More importantly special issue (2) is fundamentally different, not only from the issue of guilt, but even from the other issues of punishment which are drawn in Article 37.071(b)(1) & (3) of the Texas Code of Criminal Procedure.

The issue of guilt and those other issues of punishment call for the State to prove historical facts. Did the defendant commit the offense of capital murder? Was his conduct that caused the death of the deceased committed deliberately and with the reasonable expectation that the death of the deceased or another would result?[2] Was his conduct in killing the deceased unreasonable in response to the provocation, if any, by the deceased?[3] All the events that determine the resolution of those issues will have occurred before the trial; they will have been immutably fixed at the time they happened. If the State fails to prove guilt or deliberateness or unreasonableness, and that failure is detected on appeal, it "cannot complain of prejudice, for it has been given one fair opportunity to offer whatever proof it could assemble." *Burks v. United States*, 437 U.S. 1, 16, 98 S.Ct. 2141, 2149–50, 57 L.Ed.2d 1 (1978) (footnote omitted). Nothing could have happened during the interim between trial and appeal to have changed the crime. The alleged murder long will have been over, and "the purposes of the [Double Jeopardy] Clause would be negated were we to afford the Government an opportunity for the pro-

verbial 'second bite at the apple.'" *Id.* at 17. Therefore the Double Jeopardy Clause should bar relitigation of the historical facts of deliberateness and unreasonableness, just as it bars relitigation of the historical fact of guilt.[4]

The special issue drawn in Article 37.071(b)(2) is different. It is not one of historical fact. *Shippy v. State*, 556 S.W.2d 246, 250 (Tex.Cr.App.1977). Rather it is one of present fact, at best:[5] whether there is now, at the time of trial, a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. This fact is not immutably fixed. If we find on appeal that the proof offered at trial was insufficient, things may well have happened during the interim between trial and appeal to change the probability in question; indeed, it is almost inevitable that the appellant will have changed. He will have aged if nothing else, and probably by more than a year. He will have been confined on death row in the Ellis Unit of the Texas Department of Corrections under conditions that could produce change in the most resilient psyche. *See, generally*, B. Jackson & D. Christian, *Death Row* (1980). Any number of moral, intellectual, emotional, and behavioral changes may have occurred in him. Although the State had at his trial "one fair opportunity to offer whatever proof it could assemble" about his probable conduct at that time, it will have had no opportunity to offer proof about his probable conduct at the time of his retrial. To borrow the Chief Justice's proverb, the State has had one bite at the apple but by the time of retrial the apple may have become an orange. Because special issue (2) involves a different factual perspective, it should bear a different relationship to the Double Jeopardy

2. Tex.Code Crim.Pro. art. 37.071(b)(1).

3. Tex.Code Crim.Pro. art. 37.071(b)(3).

4. This same reasoning explains why this court was clearly wrong, in my view, to hold that the issue of a prior conviction could be relitigated on retrial because it is merely "an historical fact." *Porier v. State*, 591 S.W.2d 482, 484

(Tex.Cr.App.1979). Except for special issue (2) in a capital case, every factual issue in a criminal trial is one of historical fact.

5. Many people view it as an issue of predicting future "facts." See, e. g., *Jurek v. Texas*, 428 U.S. 262, 274–276, 96 S.Ct. 2950, 2957–58, 49 L.Ed.2d 929 (1976) (opinion of Stevens, J.).

Clause–a relationship that is less like that prescribed for the guilt issues in *Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978), and more like that prescribed for the punishment issues in *North Carolina v. Pearce*, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969).

In Part II of *Pearce*[6] the question was, after a reversal for trial error, "what constitutional limitations there may be upon the general power of a judge to impose upon reconviction a longer prison sentence than the defendant originally received." 395 U.S. at 719, 89 S.Ct. at 2077. The court held that neither the Double Jeopardy Clause nor the Equal Protection Clause imposed an absolute bar to a more severe sentence upon reconviction.

"A trial judge is not constitutionally precluded, in other words, from imposing a new sentence, whether greater or less than the original sentence, in the light of events subsequent to the first trial that may have thrown new light upon the defendant's 'life, health, habits, conduct, and mental and moral propensities.' *Williams v. New York*, 337 U.S. 241, 245 [69 S.Ct. 1079, 1082, 93 L.Ed. 1337]. Such information may come to the judge's attention from evidence adduced at the second trial itself, from a new presentence investigation, from the defendant's prison record, or possibly from other sources. The freedom of a sentencing judge to consider the defendant's conduct subsequent to the first conviction in imposing a new sentence is no more than consonant with the principle, fully approved in *Williams v. New York, supra*, that a State may adopt the 'prevalent modern philosophy of penology that the punishment should fit the offender and not merely the crime.' Id., at 247 [69 S.Ct. at 1083]."

395 U.S. at 723, 89 S.Ct. at 2079. (The court also held that, to guard against a court's penalizing a defendant for having successfully appealed his first conviction, due process requires the record to affirmatively show that the new sentence is "based upon objective information concerning identifiable conduct on the part of the defendant occurring after the time of the original sentencing proceeding." 395 U.S. at 726, 89 S.Ct. at 2081. This requirement does not apply when it is a jury rather than a judge that assesses punishment at the retrial, at least when the jury has not been given improper and prejudicial information about the prior sentence and when the same punishment is being sought under the same jury instructions. *Chaffin v. Stynchcombe*, 412 U.S. 17, 93 S.Ct. 1977, 36 L.Ed.2d 714 (1973). In such cases the possibility of vindictiveness is *de minimis*.)

It has already been held that the jury's task in answering special issue (2) is like that which faces any sentencing authority. *Jurek v. Texas*, 428 U.S. 262, 274–276, 96 S.Ct. 2950, 2957–58, 49 L.Ed.2d 929 (1976) (opinion of Stevens, J.). The reasoning of *North Carolina v. Pearce*, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), is as applicable to sentencing by the jury as by the judge. Therefore I would hold that after a reversal for trial error the State may again seek the death penalty regardless of the sufficiency of the evidence on special issue (2) at the first trial. In cases in which we have found reversible trial error, we should not even address a claim that the evidence on special issue (2) was insufficient.[7]

---

**6.** The question in Part I of *Pearce* was whether the Double Jeopardy Clause required a state to give a reconvicted defendant credit for punishment that had been exacted because of his earlier, overturned conviction.

**7.** At this time it appears that we soon may have a decision on the constitutionality of imposing a death penalty at retrial when a life sentence had been given in the first trial. See *Bullington v. Missouri*, ─ U.S. ─, 101 S.Ct. 70, 66 L.Ed.2d 21, 28 Crim.L. 4045 (1980), *granting cert. to State ex rel. Westfall v.*

*Mason*, 594 S.W.2d 908 (Mo.1980) (death sentence did not violate Constitution). In my view the death sentence in that case should be set aside because the jury in the first trial apparently found either that the aggravating circumstances were not proved or that they were outweighed by the mitigating circumstances, and the Double Jeopardy Clause would be violated if those historical facts were relitigated just as it would be violated if Texas' special issues (1) and (3) were relitigated. If

If one focuses on the results of cases, it might seem strange that a defendant can be exposed again to the death penalty after the State fails in its proof on special issue (2), while a defendant who pleaded guilty cannot be exposed to retrial after the State botches the plea ceremony. *Thornton v. State*, 601 S.W.2d 340 (Tex.Cr.App.1980). But this is the logical consequence of our truly execrable [8] statutory scheme of asking jurors to find beyond a reasonable doubt that there is a probability that a person will commit a certain kind of criminal act in the future. Would that Texas had never started down this absurd path.[9] Despite my wishes I must accept perforce that due process countenances this scheme. Having been forced to swallow the due process camel, I cannot strain at the double jeopardy gnat.

the Supreme Court so held, the question of whether special issue (2) could be relitigated after a reversal for trial error would still be open, because special issue (2) is not an issue of historical fact as are Missouri's aggravating and mitigating circumstances.

8. *See generally, Jurek v. State*, 522 S.W.2d 934, 943 & 946 (Tex.Cr.App.1975) (opinions of Odom & Roberts, JJ.); Black, "Due Process for Death," 26 Cath.U.L.Rev. 1 (1976).

9. Representative Robert Maloney, who drafted the conference committee's bill that became law, has testified that special issue (2) was intended to determine whether the defendant "was just a flat mean person ...." Perini, "Evidence of Parole as Material to Special Issue No. 2-And Other Unusual Ideas," at 24, in Criminal Defense Lawyers Project, *Capital Murder Defense Course* (1978). In my view, *the statute would have been much better if that* language had been used.