**Leon Rutherford KING, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 68633.

Court of Criminal Appeals of Texas.

March 24, 1982.

Rehearing Denied May 5, 1982.

Ken J. McLean, Houston, court appointed, for appellant.

John B. Holmes, Jr., Dist. Atty., Winston E. Cochran, Jr., Andy Tobias and Doug Shaver, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

### OPINION

CLINTON, Judge.

This cause is before us for automatic review of appellant's conviction for the offense of capital murder proscribed by V.T.C.A. Penal Code, § 19.03(a)(2),[1] as well as his sentence of death[2] assessed by the trial court pursuant to Article 37.071(e), V.A.C.C.P.

1. Section 19.03 provides in relevant part:

   "(a) A person commits an offense if he [intentionally or knowingly causes the death of an individual] under Section 19.02(a)(1) of this code and:

   . . . . .

   (2) the person intentionally commits the murder in the course of committing or attempting to commit kidnapping, . . . robbery [or] aggravated rape. . . ."

2. Article 37.071(f) provides that "[t]he judgment of conviction and sentence of death shall be subject to automatic review by the Court of Criminal Appeals. . . ."

On April 10, 1978, two Baytown young persons drove into the Houston Montrose area where they stopped at two different nightclubs. Leaving the second club at 11:30 p. m., Michael Clayton Underwood and his female companion, K_____ B_____,[3] were accosted by appellant and Allen Carter who had driven up in a maroon pickup truck. Carter exited the passenger side, brandishing a shotgun and instructed the couple to cross the street and enter the truck. The streets were deserted, so they did as they were instructed.

During the next twenty five minutes as appellant drove around, Carter took the $11.50 the couple had between them, and on discovering that Kay had only $.50, appellant hit her hard in the chest with his elbow.[4] Appellant asked Carter what he wanted to do with Underwood, to which Carter replied, "I think we ought to waste him." King said "I think that's cool," and told Carter he knew of a place where they could go and Underwood "wouldn't be found for months." Kay started crying. Appellant told her to stop crying or he would "blow [her] head off too," adding, "it wasn't anything new to him."

Carter then unzipped the back of Kay's blouse and began fondling her breasts, saying to Underwood, "I like your chick." Appellant pulled into an isolated vacant lot, up to a cement slab and stopped. Carter exited the truck, instructing Underwood to do likewise, and then Kay. At this point King objected, saying, "No, [we're] going to spare the chick. . . . We are going to fuck the

3. To shield the victim of offenses such as were committed in this cause, this Court and others sometime utilize the format in the text. However, when, as here, the complainant must be mentioned many times, the format becomes too awkward and, we believe, distracts the reader from a better understanding of the factual account we must set forth. Accordingly, we will call the victim "Kay," that being one way to spell the first initial of her full name, or identify her as "complainant."

4. Also taken were Underwood's lighter and high school class ring, as well as several items of jewelry from Kay, including her class ring.

hell out of her and then we will decide what to do." From in the truck, Kay could hear Carter and Michael Underwood talking softly without argument, but Underwood's tone sounded as if he were pleading.

Kay then observed Carter push Underwood down. The latter laid still on his stomach. Carter then called to King, who exited the truck, walked around its rear and took the shotgun from Carter. King said to Kay, "Get out of the truck; I want you to watch me waste your old man." Kay slid to the edge of the seat, where she could see Michael, lying on the concrete surface, on his stomach with his eyes closed, offering no resistance. Appellant raised the shotgun above his head and struck Underwood in the back of the head with the butt of the weapon. He raised the shotgun again and repeated the blow. At this point Kay turned her head, but, as she reported it, "He continued to hit him. I could hear it. It sounded like something just kept hitting the ground like woodchopping. . . eight or nine times." King put the shotgun in the bed of the pickup.

King and Carter both got back in the truck and after driving around a short while longer, appellant stopped, got the weapon from the back, walked out of sight for several minutes, and returned without it. When he got back in the truck, he ordered Kay to take off her clothes. Still crying, she sat motionless. Carter unzipped her blouse and pulled it off. Appellant first tried to pull the zipper on her pants down, then ripped it open and pulled off her pants. Both Carter and King got undressed, the latter instructing her to lie down in the seat with her head toward the steering wheel. The men had earlier informed her that they had a .45 caliber pistol under the seat; she did as she was told. Carter got on top of her and penetrated her vagina with his penis. Carter told her to put King's penis in her mouth, which she did.

After approximately thirty minutes of this, King and Carter traded positions. According to Kay, the two men continued the assault, switching places a number of times; during this period they talked and laughed about killing Underwood and told Kay they had been to a party where they "didn't get enough," laughing at her plight.[5] After two continuous hours of sexual assault and banter, appellant decided they had been at that spot too long and he was going to move. He drove to an apartment complex and parked under a carport. During the fifteen minute drive, Carter was having intercourse with Kay, and on arrival, appellant got back on his knees and forced her to take his penis in her mouth.

Again, King and Carter took turns raping Kay and alternately forcing their penises in her mouth continuously for two additional hours. The radio was on and when it was announced that the time was 4:45 a. m., King told Carter to "hurry up and get your nuts off, it's late and we have got to go home," whereupon Carter reached climax, with King quick to follow.

Everyone got dressed and King drove back to the Montrose area near where the couple had been abducted. King asked Kay for her address. Carter looked through her purse and found a letter from her parents; he handed it to King who tore the address off. He told Kay not to go to the police, because he had her address and would come to her apartment and kill her. As King and Carter let Kay out of the truck, appellant again threatened to kill her if she reported the night's events.

Kay got into her car and began looking for a telephone; crying and in pain, she finally just pulled into a gas station and stopped because she "couldn't drive anymore." Two men approached her car and asked if she were okay. She asked them to call the police which they did. She was immediately taken to the hospital by the officers.

---

5. Throughout the transaction, King referred to Carter as "Don," and Carter called him "Le- roy."

Appellant does not challenge the sufficiency of the evidence to support the jury's verdict of guilt, and it clearly is enough.

■ By his first ground of error, appellant contends the trial court erred in refusing to allow voir dire examination of the venire upon the length of time a capital murder convict would serve before he became eligible for parole, in the event a life sentence were assessed.

Specifically, appellant reasons that in view of his entitlement to a challenge for cause of any prospective juror who "has a bias or prejudice against any phase of the law applicable to the case upon which the defense is entitled to rely... *as mitigation... of the punishment*,"[6] he should be allowed to inquire about the jurors' knowledge of our statutes[7] which prescribe a minimum of twenty years be served before a life offender is eligible for parole, because this minimum eligibility requirement is "in effect, part and parcel of the 'range of punishment' applicable" to the offense of capital murder. This contention is without merit.

It is the premise of this argument—that parole eligibility is a part of the range of punishment—which causes it to fail. By definition, the "range of punishment" is that within which the *jury* is authorized by law to assess a penalty. And such authorization, in turn, is accomplished through the instructions to the jury given by the trial court in "distinctly setting forth the law applicable to the case." Article 36.14, V.A.C.C.P. Contrary to the implication inherent in this contention, a jury has no

power to effect or affect a minimum parole eligibility on any sentence; thus, the minimum term of incarceration required for that eligibility is clearly not a part of any "range of punishment" prescribed for an offense, including capital murder.

Appellant's first ground of error is overruled.[8]

In grounds of error two and six, appellant complains of the trial court's permitting the testimony of Houston police officers L. L. Dawson and Tim Thomas regarding hearsay statements made by Kay describing the capital murder transaction in issue; he says it served only to bolster her unimpeached testimony.[9]

Officers Dawson and Thomas received a radio dispatch to their patrol unit at 4:55 a. m. on April 11, 1978 and pursuant thereto proceeded to find Kay sitting in her car at a gas station which was not open. When the officers approached her car, they could see her sitting inside, crying "quite hard" with her head down. Once her attention was gotten, Kay did not recognize the two men as policemen. According to Dawson,

"She was crying and screaming and incoherent and she backed away from us more to the center of her vehicle. After talking to her a few minutes she unlocked the door. * * * She was still carrying on. * * * She said they killed him, they killed him. * * * Her face was puffed. She had been crying and her makeup had been running. [Her] lips were puffed. Her hair was matted and dirty. Her clothes were disarrayed and soiled and she was just a mess."

This, of course, presents an entirely different question on which neither the trial court nor this Court has been called to pass in this case.

---

6. See Article 35.16(c)(2), V.A.C.C.P. (All emphasis is supplied throughout by the writer of this opinion unless otherwise indicated.)

7. See Article 42.12, § 3f(a)(1)(A), and § 15(b), V.A.C.C.P.

8. The remainder of appellant's arguments under this ground of error advance the notion that, as a matter of relevant information, juries in capital cases would be aided by *evidence* concerning the operation of parole eligibility, in determining whether the second punishment issue, Article 37.071(b)(2), V.A.C.C.P., should be answered so as to mitigate the punishment to life confinement.

9. " 'Bolstering' occurs when one item of evidence is improperly used by a party to add credence or weight to some earlier unimpeached piece of evidence offered by the same party. E.g., *Lyons v. State*, 388 S.W.2d 950 (Tex.Cr.App.1965); *Acker v. State*, 421 S.W.2d 398 (Tex.Cr.App.1967); *Frison v. State*, 473 S.W.2d 479 (Tex.Cr.App.1971)." *Pless v. State*, 576 S.W.2d 83, 84 (Tex.Cr.App.1978).

Once the complainant unlocked the door of her car, the officers helped her out, but she collapsed. They caught her before she fell to the ground, and walked her about ten or twelve feet toward their patrol car, but she collapsed again; they picked her up and carried her, placing her in the backseat. Thomas asked her if she wanted to go to a hospital. She said she did. Dawson drove complainant's car and Thomas drove her, to Ben Taub Hospital.

During the two to three minute trip, Thomas would try to talk to the complainant, but she could not maintain her train of thought, and would repeatedly break off the end of sentences, blurting out, "I know they killed Michael." Arriving at the hospital, the officers again had to support her as she walked. Thomas suggested she zip her pants, and on discovering the zipper was broken, he had her take her shirt tail out to cover the gap. She was taken to the admission desk, where Dawson had to furnish some information to the nurse because complainant could not coherently respond to the questions. The officer then took her to a private room in order to talk. Thomas—who had been trying to reassure her that Michael probably was in a hospital somewhere—proceeded to inquire throughout the city by telephone, whether Underwood had been found. In the interim, Dawson talked to her and was able to ascertain more particularly what had happened. Though she was still crying, she was more coherent at this point. After Thomas returned to report that Underwood had not been found, he called complainant's employer in Baytown, who immediately left for Houston.[10] In the police report Dawson made at approximately 6:30 a. m., he described her as "incoherent and in mild shock."

Thomas testified that during the period he spent with complainant, some forty five minutes to an hour:

10. The complainant had no family in Texas; her parents resided in the Midwest at the time of the offense.

11. Of course the State was obliged to establish an aggravated rape in this capital case because of the legal theories on which the indictment was based. See n. 1 ante.

"She was physically shaking. She was crying off and on. Her face was bruised as I described. Her clothes were wrinkled. Her hair matted and dirty. She couldn't maintain her train of thought."

■ Initially, we observe the well settled evidentiary proposition that statements constituting a rape victim's complaint—also called "outcry"—are admissible in the State's case in chief as direct evidence of that complaint and this is so without regard to the spontaneity thereof.[11] *Ortega v. State*, 462 S.W.2d 296 (Tex.Cr.App.1970); see also *Hanner v. State*, 572 S.W.2d 702 (Tex.Cr.App.1978) *cert. den.* 440 U.S. 961, 99 S.Ct. 1504, 59 L.Ed.2d 774 and *Price v. State*, 496 S.W.2d 103 (Tex.Cr.App.1973).

"While this ... may seem somewhat inconsistent with the usual rule that no witness or party may be thus bolstered up, by proof of prior consistent statements, before the opponent has attacked him by impeaching evidence, the exception in this case is warranted by the usually strong popular aspersion which would be cast upon the [complainant] by failure to complain in cases of rape."

Ray, Law of Evidence § 927, 1A Texas Practice 189, 190 (3rd ed. 1980).

■ Additionally, it is a well recognized exception to the general prohibition against hearsay evidence, that statements made while in the grip of violent emotion, excitement or pain, and which relate to the exciting event, are admissible under the rationale that the capacity for reflection necessary to the fabrication of a falsehood is lost. Ray, op. cit., §§ 913 and 918. See *Sellers v. State*, 588 S.W.2d 915 (Tex.Cr.App.1979); *Knox v. State*, 487 S.W.2d 322 (Tex.Cr.App. 1972); *Tezeno v. State*, 484 S.W.2d 374 (Tex.Cr.App.1972); *Fowler v. State*, 379

Furthermore, there can be no question that the murder of Michael Underwood and the aggravated rape of Kay, were so closely interwoven as to constitute one continuous transaction. See *Rios v. State*, 557 S.W.2d 87 (Tex.Cr.App. 1977).

S.W.2d 345 (Tex.Cr.App.1964). Often unconducively labeled "*res gestae*,"[12] the modern and more utilitarian nomenclature for this type of evidence, is "spontaneous exclamations."[13] See generally Ray, op. cit., § 912.

> "It is believed that the phrases so often used in the decisions relating to this sort of exclamations, to the effect that they are or must be 'verbal acts,' or 'the transaction speaking through the party' are merely metaphorical expressions of the basic requirement... that the exclamations must be made by one whose deliberative faculties are suspended by the stress of excitement produced by a startling event."

Ray, op. cit., § 913 at 154, see also *Martinez v. State*, 533 S.W.2d 20 (Tex.Cr.App.1976)

Appellant's second ground of error specifically complains of twenty seven rulings of the trial court made on objections lodged during the testimony of Officer Dawson, on

**12.** We say this merely because so many other, wholly unrelated types of evidence which are admissible for a diversity of reasons, are also called "res gestae." Thus use of the term is of little assistance in analyzing the admissibility of particular evidence.

**13.** In the Federal Rules of Evidence such exclamation is called an "excited utterance," Rule 803(2).

**14.** This ground of error is, of course, multifarious. Appellant, however, argues that such is justified in view of the trial court's refusal to approve his requested "running objection." But the record first reflects the court's *sustaining* his objections to the witness' testimony in narrative form. Thus, it was appropriate that the trial court insisted upon timely specific objections to each question posed; this is particularly true since, as discussed in the text, each statement sought to be elicited was admissible or objectionable for varying reasons.

**15.** In some cases, no ruling was obtained; in others, though an adverse ruling was made, no answer was given and the State did not pursue the question. But in the overwhelming majority of instances, the record reveals for example the following:

> "Q: Did she tell you what happened to Michael C. Underwood?
> [DEFENSE]: Objection to bolstering.
> THE COURT: Overruled.
> A: (By witness) Yes sir.
> Q: *What was that*?

the ground that the answer would bolster the testimony of the complainant.[14] Our review of the testimony reveals that only four of the cited objections were timely offered, overruled and thus preserved for review.[15]

Dawson was asked what the complainant told him about how she and Underwood were taken from the Montrose area. A timely objection was lodged, overruled and the prosecutor continued,

> "Q: Did she say how she went away?
> A: *They were abducted with a shotgun?*"

Later in Dawson's testimony, he was asked whether the complainant had told him what happened after appellant had beat Underwood with the shotgun and returned with Carter to the truck; on his affirmative reply, the prosecutor asked,

> "Q: What was that?
> [DEFENSE]: Same objection.

A: That he had been removed from the vehicle.
Q: Did she tell you how he was removed?
A: Yes sir, the younger of the two males got him out and walked him to the back of the pickup truck.
[DEFENSE]: I object to bolstering.
THE COURT: Overruled.

\*　\*　\*　\*　\*　\*

Q: Did she tell you what he did at that location?
A: Yes sir.
Q: *What did she tell you*?
A: He took the shotgun the younger of the two males had and swung it.
[DEFENSE]: Same objection.
THE COURT: Overruled."

The only questions asked by the prosecutor in this recited sequence which were objectionable on the grounds of hearsay, bolstering the complainant's testimony, are italicized above; neither was objected to timely.

Clearly, when the prosecutor asked *whether* the complainant had told the officers what happened, the responsive answer was "yes" or "no" and constituted the "bare fact" of her outcry. Thus, appellant's objections were appropriately overruled.

The witnesses' answers were at times objectionable on the grounds that they were "not responsive." But no such objection was offered and we believe the trial court was correct in overruling objections to "bolstering" on these occasions.

THE COURT: Overruled.

A:   *They left that location and went to another location."*

Later still, Dawson was asked whether complainant had told him what happened once appellant and his companion took her to an apartment complex and parked under a carport. He confirmed that she had, and the following transpired:

"Q:   What was that?

[DEFENSE]: Same objection.

THE COURT: Overruled.

A:   *She was sexually abused.*

Q:   Did she say by who [sic]?

A:   Yes sir.

[DEFENSE]: Same objection.

THE COURT: Overruled.

Q:   Who was that?

[DEFENSE]: Same objection.

THE COURT: Overruled.

A:   *The same two males."*

■ On appeal, appellant assigns much significance to the fact that he did not crossexamine the complainant, and thus, *"at this point in the trial*, she was a totally unimpeached witness" whose prior consistent statements were inadmissible. What appellant overlooks is the effect of his own testimony offered in the defense's case in chief. According to appellant, a third man named "Leroy" took Underwood, while he took the complainant riding in his truck, picking Allen Carter up later. He admitted he and Carter had oral and sexual intercourse with complainant, but denied the use of force or threats. Thus, appellant testified to two of the same facts as those attributed to complainant by Dawson which were preserved for review. Compare *Patterson v. State*, 458 S.W.2d 658 (Tex.Cr. App.1970).

The other statements—that complainant told Dawson she and Underwood were abducted at gunpoint and she was "sexually abused"—were admissible to establish the bare fact of her outcry, if not as spontaneous exclamations as well. *Hanner*, supra; *Price*, supra; and *Knox*, supra. Even if these statements had been erroneously admitted, there can be no doubt that they would have been rendered admissible in rebuttal when appellant contested complainant's direct testimony regarding his use of force and threats against her to accomplish the rape. *Pless v. State*, supra, at 84; cf. *Rubio v. State*, 607 S.W.2d 498 (Tex.Cr.App. 1980). This second ground of error is overruled.

Appellant's sixth ground of error concerning the same subject, but complaining of the testimony of Officer Thomas, is also without merit. Without referring us to any ruling of the trial court, see Article 40.09, § 9, V.A.C.C.P., appellant simply asserts that "approximately 10 objections on the grounds of improper bolstering" were made to Thomas' testimony regarding statements made by the complainant when the officers first confronted her, and then on the way to Ben Taub Hospital.

■ Though our review of the record reveals nine objections voiced on the ground asserted, only one was interposed timely. The answer elicited by the question appellant timely objected to was:

"[When we opened the car door on first confronting complainant and asked her what happened], she told me . . . that she had been raped and they had killed Michael."

Under the facts established by the State, there can be no doubt that this was a spontaneous declaration which was admissible as an exception to the hearsay prohibition as discussed *ante*. Appellant, however, argues that, since this statement was prompted by the officers' question, the requisite quality of spontaneity was lacking and, as such, it is inadmissible hearsay. But the authorities make it clear that the fact that a statement is a response to a question is but one factor to consider in determining its spontaneity. *Tezeno*, supra; *Ricando v. State*, 475 S.W.2d 793 (Tex.Cr.App.1971); *Moore v. State*, 440 S.W.2d 643 (Tex.Cr.App.1969); *Morris v. State*, 246 S.W.2d 184 (Tex.Cr. App.1952); *Chambers v. State*, 103 Tex. Cr.R. 674, 282 S.W. 235 (1926); see also *Lockhart v. State*, 53 Tex.Cr. 589, 111 S.W. 1024 (1908).

Furthermore, it has been held that where the appearance of a victim of violent crime is such as would normally "exite remark" the fact that her declaration is made in response to being asked, "what happened?," affects only the weight, and not the admissibility of her reply. *Conger v. State*, 63 Tex.Cr. 312, 140 S.W. 1112 (1911). See, e.g., *Patterson*, supra; and *Zilka v. State*, 385 S.W.2d 680 (Tex.Cr.App.1964). We are constrained to hold that upon considering all relevant circumstances surrounding the declaration, including the condition of the complainant, her statement was admissible both as establishing the "fact of complaint," and as a spontaneous declaration. *Hanner*, supra; *Ortega*, supra; see also *Price*, supra; and *Wilder v. State*, 169 Tex.Cr.R. 255, 333 S.W.2d 367 (1960) [statements made to officer driving victim to station held admissible].

■ Lastly, appellant contends in this ground of error that five straight objections on the ground of bolstering were lodged to questions asked Officer Thomas regarding statements by the complainant to him at the hospital, and were improperly overruled by the trial court. Again, our review reflects appellant's objections to have been voiced prematurely (see n.15) in each case but one. The answer elicited over this objection was that complainant told the witness "they had been picked up by two black males at Theodore's." [16] Since appellant also testified to this fact, we perceive no reversible error. *Patterson*, supra.

This sixth ground of error is overruled.

By his third ground of error, appellant contends that "the trial court erred in overruling [his] objection to the search of the glove compartment of [his] truck" which resulted in the discovery of his identity. In his fourth ground of error, appellant complains of his subsequent warrantless arrest and the admission into evidence of certain items seized from his person incident thereto. He bottoms each contention upon the Fourth Amendment to the Constitution of the United States, as well as the Constitution and applicable statutes of this State.

Placing these grounds in context, the record reflects that at 7:30 or 8:00 a. m. on the day of the offense, a citizen, John Haver, saw what appeared to be a body lying off the side of the road in an area located in the "Third Ward" which was "kind of hard to get to." Haver immediately radioed the police. Homicide Detective A. Vizina arrived on the scene at 8:30 a. m. to find the body of Michael Clayton Underwood, and thereafter supervised the crime scene investigation.

At 2:00 p. m. roll call on the same day, Patrol Officer M. L. Williams, along with others going on the afternoon shift, was informed of the murder of Underwood and rape of Kay which had occurred that morning. The officers were told to be on the lookout for a late model maroon pickup which had been occupied by two black males, one tall and older, the other short and very young. There was apparently also some speculation that the suspects were residents of the "Third Ward" in view of the fact that Underwood had been killed and left at the isolated location. Williams was then assigned to patrol the southeast section near downtown Houston, locally known as the "Third Ward."

At approximately 3:30 p. m., Williams observed a maroon pickup truck driven by a black male. With his red light turned on, Williams stopped the driver; he requested a driver's license and the occupant, Diez Louis, Jr., handed the license to Williams. The officer determined that Louis did not match the description of the kidnapping, robbery, murder, rape suspects, but wrote down Louis' name and address. He then asked Louis who owned the truck. Louis replied that it was a rent car, rented by Leon King. Williams asked if there were any rental papers. Louis said he would have to check the glove box and he opened it; Williams observed a brown wallet inside, and asked Louis if he could see it.

---

**16.** Theodore's was the last club in the Montrose area that complainant and Underwood had stopped before they were abducted.

Louis handed the wallet to Williams. The latter looked inside and found a driver's license for Leon Rutherford King. He wrote down the name, address and date of birth, then handed the wallet back to Louis and released him.

Williams proceeded immediately to the police station and went to the Identification Division to see if Leon King had a rap sheet. He did. There was a "flag" on the rap sheet that there was an outstanding warrant for King's arrest as of February 15, 1977, for rape of a child. Williams pulled the photograph and at approximately 4:15 p. m. he arrived at the Homicide Division of the Houston Police Department. He there spoke with Detective Paula Fleming who had been working with Kay, the complainant, since 2:15 p. m. that day. Fleming advised Williams that the complainant had begun work on composite drawings at 2:00 p. m. and could not be disturbed until that task was completed. So Williams left the photograph and rap sheet with Fleming, telling her to show the photo to complainant as soon as possible, that he would call her and give her his location as soon as he set up surveillance.

About 4:20 p. m., Williams contacted Officer T. W. Carpenter and told him to set up surveillance on the 2500 block of Benz, which included Diez Louis' address, and watch for the maroon pickup. Immediately Williams was told the truck was there. At 5:15 p. m., Carpenter was told by Williams to stop anyone leaving in the truck. At 5:25 p. m., Williams located a telephone at a construction site, called Detective Fleming and left the telephone number. Carpenter advised Williams that two people had left the house. Williams stopped them and asked whether Leon King was inside. They said they did not know.

On returning to his surveillance position, Williams was told he had a telephone call. At approximately 5:35 p. m. Williams went to the phone and was told by Detective Fleming that the complainant had made a

positive identification of Leon King; she instructed Williams not to leave his location and not to let King get away. As Williams returned to his patrol car, the central dispatcher was notifying all other units of King's identification, and in less than ten minutes—at 5:45 p. m.—Leon Rutherford King came out of the Benz Street house and got into the maroon pickup.

Appellant took off west down Benz toward a deadend; he turned around and as he headed east Officer Carpenter and his partner Walls, blocked the pickup. Appellant was arrested, handcuffed and patted down. From his right sock, Carpenter obtained a torn piece of paper which had Kay's address written on it. Later, appellant's clothing was taken and analyzed. Appellant's truck was also searched.[17]

As to Officer Williams' earlier stop of the maroon pickup driven by Diez Louis, the following objection was voiced and relief sought at trial:

"I object to the gathering of the billfold and information out of it on the grounds that we have grounds to object to it. [Louis] could not consent to giving that material to the officer and I would object to *any evidence that would come in as a result of gathering this particular information.*"

On appeal, we are referred to a written motion to suppress contained in the record; however, this motion clearly does not in any fashion address the stop of Diez Louis. And, by way of argument under this ground of error, appellant concludes that,

"... the search of his vehicle, and the subsequent 'seizure' of his billfold, for the purpose of obtaining information therefrom, *which eventually led to his arrest,* constituted a denial of Due Process, under the doctrine of 'fruits of the poisonous tree,' where it can be shown that such initial invalid 'search' subsequently led to the arrest of Appellant...."

17. Items seized from the pickup were, however, suppressed by the trial court on appellant's motion.

On this basis, we are asked to "reverse and remand" appellant's conviction.

Though his third ground is somewhat short in complying with Article 40.09, § 9, V.A.C.C.P.,[18] we shall take it that appellant sought the suppression of any evidence obtained directly or indirectly as a result of Officer Williams' looking inside his wallet, during the time Diez Louis was detained, on the afternoon in question.

At trial, appellant conceded he has no standing to contest the "seizure"[19] of Louis' person, nor anything obtained as a result thereof. Yet clearly, it was from Louis' driver's license that Williams obtained the Benz Street address on which the officers subsequently set up surveillance. Moreover, there is no indication from the record that Williams made use of any information regarding appellant, other than his name. The testimony reflects appellant's name was first given to Williams by Diez Louis upon the officer's inquiry as to the owner of the truck—before he examined the wallet.

■ In sum, we need not decide whether appellant has standing to complain of the officer's perusal of his wallet, or whether Louis had the authority to consent thereto, since the record does not reflect the admission of any evidence obtained as a result thereof. *Brewster v. State*, 606 S.W.2d 325 (Tex.Cr.App.1980); see also *Galitz v. State*, 617 S.W.2d 949, 952, n.10 (Tex.Cr.App.1981) [explicating purpose of objections to evidence]. This third ground of error is overruled.

Arguing his fourth ground of error, appellant narrows the issue to whether his warrantless arrest was justified under the provisions of Article 14.04, V.A.C.C.P., which provides:

"When it is shown by satisfactory proof to a peace officer, upon the representation of a credible person, that a felony has been committed, and that the offender is about to escape, so that there is no time to procure a warrant, such peace officer may, without warrant, pursue and arrest the accused."

Detective Paula Fleming gave Officer Williams the instruction to "stay there" and not "let [appellant] get away," as soon as the complainant positively identified him from a photographic lineup at approximately 5:35 p. m. According to Detective Fleming, before that time, she did not have probable cause to obtain a warrant. After the identification of appellant, she immediately began recording the events surrounding the identification in a written offense report which the District Attorney's Office requires before filing charges. She testified that the District Attorney's Office always draws up warrants for arrest based on such reports and police officers never go directly to the courts with affidavits for warrants. Fleming stated that by the time she finished her report at 6:00 p. m. that evening, appellant had already been arrested. It was Fleming's opinion that between the time she first gained probable cause and began typing the necessary report thereof, and the time appellant appeared and got into his pickup to leave, there was no time to obtain a warrant for his arrest.

Officer Carpenter, who actually effected appellant's arrest, testified that he had reason to believe appellant might be escaping and did not feel that he could have effec-

18. That provision reads in relevant part:
"Each ground of error shall briefly refer to ... *admission* ... *of evidence*, ... *designated* to be complained of in such a way so that the point of objection can be *clearly identified and understood by the Court.* If the appellant includes in his brief arguments supporting a particular ground of error, they shall be construed with it in determining what point of objection is sought to be presented by such ground of error; and *if the court,* upon consideration of such ground of error in the light of arguments made in sup-

port thereof in the brief, *can identify and understand* such point of objection, the same shall be reviewed notwithstanding any generality, [or] vagueness ... that may exist in the language employed to set forth such ground of error."

19. There can be no question that Louis was "seized" within the meaning of the Fourth Amendment when Officer Williams caused him to stop by turning on the red light on his patrol car. See generally *Galitz v. State*, 617 S.W.2d 949 (Tex.Cr.App.1981).

tively pursued him.[20] Carpenter also testified that Officer Williams had earlier advised him of an outstanding warrant for appellant, on which he should be arrested.[21] Similarly, Williams testified that between the time he received word from Fleming that appellant had been positively identified, and the time he received a radio transmission that someone was leaving the house and getting into the suspected truck, there was no time to get a warrant. Williams also vehemently defended the arrest on the basis of the outstanding warrant in the unrelated case.

Appellant contends that the record fails to reflect that the arresting officers had any "knowledge [or] reasonable suspicion" that he was "about to escape." He argues that the officers had *"personal knowledge"* that he had loaned his truck to Diez Louis "and there obviously had been no effort on appellant's part to *flee,* even though some 12 hours had elapsed since... the commission of the offense," [Original emphasis], citing *Hardison v. State,* 597 S.W.2d 355 (Tex.Cr.App.1980)[22]

■ Appellant is correct that "imminent escape" on the part of the offender is a fundamental prerequisite to a valid warrantless arrest pursuant to Article 14.04, supra. *Honeycutt v. State,* 499 S.W.2d 662 (Tex.Cr.App.1973); *Rippy v. State,* 122 Tex. Cr.R. 101, 53 S.W.2d 619 (1931). In *Honeycutt,* supra, Presiding Judge Onion observed,

"In accordance with the strict construction given exceptions allowing warrantless arrests, this Court has always required a clear showing *that the person arrested is about to escape.* As is often said when considering an arrest without a

warrant, inarticulate hunches and suspicions are not enough.... [citations omitted]

Only recently this Court stated 'The constitutional validity of a warrantless arrest or search can only be decided in terms of *the concrete factual situation presented* by each individual case.' *Brown v. State* [481 S.W.2d 106, 109 (Tex. Cr.App.1972) ]."

499 S.W.2d at 665. Thus, manifestly, from the "concrete factual situation" spread on the record, it must be apparent that the offender was, in fact, "about to escape." Compare, e.g., *Tarpley v. State,* 565 S.W.2d 525 (Tex.Cr.App.1978) with *Hardison,* supra, and *Honeycutt,* supra.

So, using appellant's own rationale, it is clear that the officers—at least Williams— also had "personal knowledge" that the person to whom appellant had loaned his truck had been stopped by a uniformed police officer within the preceding two hours and questioned about the truck and its "owner." Though somewhat amorphous in this regard (see n.20 *ante),* the testimony indicates the officers' expectation that appellant would eventually *rendezvous* with Louis in order to retrieve the car keys and the maroon pickup which contained his wallet; thus the stakeout on Louis' house. Thus, there obviously was perceived more than the likelihood that Louis, in person or otherwise, would at such time report to appellant the most recent interest shown by the police in the pickup and its owner. Once probable cause to believe Leon King *had* committed the offense in question was added to these circumstances already within the officers' knowledge, a suspicion that he would attempt to elude the police was well founded.

---

**20.** Unfortunately, the State did not develop the reason for Carpenter's belief in this regard; neither did the State make any effort to establish facts which would illustrate that appellant was "about to escape" through any other witness.

**21.** The day after appellant's arrest, an entry was made on his rap sheet that he had made bond on the pending case and was no longer wanted.

On crossexamination, Officer Williams insisted that a year old warrant for someone's arrest was not "very old" and would not indicate an affirmative obligation to check on its status.

**22.** Appellant also cites *Milton v. State,* 549 S.W.2d 190 (Tex.Cr.App.1977) and *Bazan v. State,* 522 S.W.2d 224 (Tex.Cr.App.1975), but neither is relevant, the former having been decided without regard to Article 14.04, supra, and the latter having been reversed for lack of probable cause.

But within ten minutes of the convergence of all these facts, when appellant appeared, entered the pickup and drove away, the "factual situation" indicating he was about to escape became "concrete." [23]

■ We accordingly find the record establishes that, nearly simultaneous with the officers' receipt of probable cause to arrest appellant, his flight was imminent, there was not time to procure a warrant and pursuit was authorized; appellant's warrantless arrest was justified under the "concrete factual situation" presented in this case. Article 14.04, supra. See *Rodgers v. State*, 448 S.W.2d 465 (Tex.Cr.App.1970); *Trammell v. State*, 445 S.W.2d 190 (Tex.Cr.App.1969); see also *Scott v. State*, 531 S.W.2d 825 (Tex.Cr.App.1976). It is therefore unnecessary for us to address the legality of an arrest made upon a year old warrant which is subsequently shown to have been invalid.[24]

Appellant's fourth ground of error is overruled.

Appellant next contends the trial court erred in overruling his motion to suppress the results of a blood analysis conducted upon blood taken from him without his consent at a time when he was in custody pursuant to an unlawful arrest. Without citing us to the record, appellant asserts that his "objection to the admissibility of blood test comparisons was overruled."

For its part, the State concedes the admission of the blood test results in this cause constituted error since neither appellant's consent, nor a warrant was obtained authorizing the seizure of appellant's blood, citing *Ferguson v. State*, 573 S.W.2d 516 (Tex.Cr.App.1978); the State contends, however, that admission of appellant's blood type into evidence was harmless beyond a reasonable doubt. *Ferguson*, supra.

■ Once again we are asked to address a ground of error without much reference to its basis. Appellant neither directs us to any ruling of the trial court, nor to the admission of any evidence complained of in this ground of error. In fact, our independent review of the transcript, as well as the transcription of the court reporter's notes in this cause, reveals no objection whatever to the admission into evidence of appellant's blood type.[25] Nothing is presented for review, so this fifth ground of error is without merit.[26]

**23.** Indeed, at the end of appellant's direct testimony, he affirmed that he had personally talked with Louis when he came to pick up the keys to his truck; Louis had informed him of being stopped by the police and the officer's looking at appellant's driver's license. Though denying concern, appellant admitted that on hearing this he immediately went out to leave in the pickup.

**24.** Neither is it necessary to discuss at length the fact that under appellant's testimony, the items seized as a result of his arrest—the torn envelope and address, and his bloody pants—were not probative of his guilt. Though arguably such testimony rendered any error in the admission of these items harmless, we treat it as an effort to meet, destroy or explain evidence admitted over his objection.

**25.** The only mention of appellant's blood type we have found was made by Police Chemist and Toxicologist James Zotter who had testified that the deceased's blood type was A, and blood found on the right rear quarter panel of the maroon pickup was human blood type A. The following then occurred:

"Q: Did you have occasion to do anything with the blood you recovered from Leon Rutherford King—the known blood?
A: Yes sir, I did.
Q: What did you do please?
A: Well, I did a type on it.
Q: What type of blood does the defendant, Leon Rutherford King, have here in court today?
A: Type O blood."
The only written "Motion to Suppress" in the record before us requests the suppression of items seized from appellant and his pickup truck as a result of his warrantless arrest. Even if we were to so liberally construe that motion as to have intended the suppression of appellant's blood seized hours after his arrest, our disposition of the preceding ground of error would dictate that we overrule the one before us as well.

**26.** The State informs us that blood was taken from appellant and typed in order to rule out the possibility that blood stains on the panel of the pickup came from him. We notice that when photographs depicting the blood stains on the pickup panel were offered, appellant stated, "No objection."

Ground of error seven complains of the trial court's failure to grant his motion for mistrial when the prosecutor elicited testimony regarding Kay's psychiatric condition upon her redirect examination. And ground of error eight contends the prosecutor committed reversible error by arguing matters concerning the complainant's psychiatric condition at the guilt-innocence phase of trial, over objection.

The record reflects that defense counsel reserved their right to crossexamine the complainant until the presentation of appellant's case in chief. The first witness called by the defense was Robert Toth, M.D., a former practitioner of emergency medicine. Toth was given State's Exhibit 123, the medical report compiled upon the complainant's admission to Ben Taub Hospital on the morning of the offense. The purpose of this witness' testimony was to establish that certain observations reflected on the report were consistent with sexual intercourse, but "by no means" conclusive of rape. Dr. Toth also testified that if the examining physician found bleeding from the vaginal vault but was unable to determine its origin, he "must only have speculated that the bleeding was from an injury. It might have been a menstrual period."

Appellant then called the complainant. The defense merely tested Kay's recollection of details and made no serious attempt to impeach her. On redirect, the prosecutor elicited from her that she was not menstruating at or near the time of the offense. She also testified that when appellant and Carter told Michael they were going to kill him, he squeezed her hand, as a gesture of reassurance. She said Michael never said anything else again to anyone. Then the following:

"Q: As a result of this—these acts that you have testified about have you received any other type of medical treatment since then?

A: Yes sir.

Q: Tell us what type, please ma'am?
    [DEFENSE]: We object. It's immaterial and irrelevant at this time.
    THE COURT: Overruled.

A: (By witness) I am seeing a psychiatrist.

Q: And how long have you been seeing a psychiatrist?

A: Since April of '78.

Q: Have you seen one or more than one?

A: More than one.

Q: How many psychiatrists—
    [DEFENSE]: *None of this testimony, Your Honor, goes to the question of guilt or innocence.*
    THE COURT: *Sustained."*

Whereupon, the trial court, at defense counsel's behest, instructed the jury to disregard the last question. The redirect continued:

"Q: Where did you spend last Christmas?

A: The psychiatric unit at a hospital.
    [DEFENSE]: *Objection.*
    THE COURT: *Sustained.*
    [DEFENSE]: I ask that the jury be instructed to disregard it.
    THE COURT: *The jury will disregard the last question and answer.*
    [DEFENSE]: And I *move for a mistrial.*
    THE COURT: *Overruled."*

The prosecutor then abandoned this line of inquiry.

Leon King then took the stand to testify in his own defense. As stated *ante,* appellant contradicted Kay's testimony only in material regard to his use of force and threats to accomplish the abduction and rape, and his participation in the murder of Underwood.

After both sides rested and the charge was read to the jury, the State waived the right to open final argument. Essentially, defense counsel recounted the testimony, then pointed out that the jury's decision would ultimately require a credibility call. He particularly emphasized the improbability that a person who would commit such a brutal murder would free the only surviving witness to it.

In response, the prosecutor cited testimony of the "anger, hate and resentment" observed on appellant's face as he beat the

deceased to death, then recounted the testimony of the pathologist who performed the autopsy, that of autopsies on victims of airplane crashes, train wrecks and the like, she had only once before seen skull fractures comparable to those sustained by Underwood, and suggested that "after sexually abusing the young lady three or four hours some of the rage and resentment was gone." The prosecutor continued,

> "That's the only reason I can suggest that she is alive. Let's look at all the evidence. I want to go over the evidence because I feel it is necessary. If K_____ B_____ is lying and if Leon Rutherford King is telling the truth *that young lady has wasted I don't know how many sessions with psychiatrists* and you know—
>> [DEFENSE]: Objection. That is not supported by the evidence.
>> THE COURT: Overruled."

Appellant now contends in argument under his seventh ground of error that the complainant's psychiatric condition was immaterial to the issue of whether he committed the capital murder of Michael Underwood as alleged in the indictment.

The trial judge was apparently inclined to agree with appellant, judging by her ruling and instruction. Appellant nevertheless contends that the admission of evidence of the complainant's spending the preceding Christmas in a psychiatric ward could only be cured by the declaration of a mistrial, because "the jury was led to believe that Appellant's acts in the commission of this offense led to the necessity of this psychiatric treatment."

■ We cannot agree with appellant that such an implication would be so prejudicial as to require a mistrial in this case. Furthermore, the testimony itself attributed complainant's psychiatric condition to the events suffered by her through the ear-

ly morning of April 11, 1978. We therefore hold the trial court's instruction to the jury to disregard was fully adequate to protect appellant's rights to a fair trial under the circumstances presented.[27] See *Todd v. State*, 598 S.W.2d 286 (Tex.Cr.App.1980).

■ As to appellant's complaint regarding the prosecutor's final argument, we need say nothing other than that such argument was clearly a reasonable deduction from the evidence, including evidence which was not objected to, or to which an objection was overruled. *Todd*, supra. As such, no error is shown.

Grounds of error seven and eight are overruled.

■ In his ninth ground of error, appellant asserts reversible error attended the trial court's refusal to grant a mistrial when, at the punishment phase, a former Harris County assistant district attorney stated appellant was a "habitual criminal." Specifically, Skip Cornelius was called by the State to testify in relation to an extraneous rape transaction allegedly committed by appellant; Cornelius testified that on September 24, 1977, he was screening cases in his capacity as an assistant district attorney in Harris County and had occasion to interview the complainant in the extraneous transaction.

The testimony complained of was as follows:

> "Q: Why did you file aggravated assault [as opposed to aggravated rape or other] charges, please sir?
> A: I had a number of options of charges to be filed in that case based on the facts related to me by the police. Among the other things that I knew was the allegation that *the defendant was a habitual criminal which meant that he had*—

---

27. One of the circumstances we have heavily considered is the fact that appellant next took the witness stand and directly attacked the complainant's credibility. This arguably rendered her psychiatric condition probative of whether her version of the offense was true. Another is the fact that a major theme through- out appellant's defensive evidence was that his sexual intercourse with complainant was consensual; thus, her psychiatric condition extant since the time of the offense was not without probative value on the "lack of consent" element of the offense charged.

[DEFENSE]: I object to that, Your Honor. It is highly prejudicial and I ask the jury be instructed to disregard it.

THE COURT: Sustained. The jury will disregard it.

[DEFENSE]: And reluctantly I ask for a mistrial.

THE COURT: Overruled."

Appellant insists that this testimony interjected such prejudice in regard to appropriate matters for the jury to consider in determining the second special punishment issue,[28] that nothing short of the declaration of a mistrial could have cured the error. We disagree.

Appellant analogizes the instant testimony with that adduced in *Allen v. State*, 513 S.W.2d 556 (Tex.Cr.App.1974) wherein an experienced police officer gave an unresponsive answer to a question asked on crossexamination which suggested the defendant's commission of extraneous offenses. Aside from the fact that a majority of the Court concluded in *Allen*, supra, that an instruction to disregard cured any error, we fail to appreciate the analogy, for in the instant case Cornelius' answer was fully responsive to the question posed.

Furthermore, any inference the jury might have drawn from the statement regarding appellant's prior record of convictions, was certainly not the first news of that record. Appellant's own testimony given during the guilt phase of trial established his prior felony convictions, and at the punishment phase the State introduced without objection Exhibits 127, 128 and 129, three "pen packets" which contained the official records of those convictions. Thus, even if the witness had been permitted to continue and explain what he meant by "habitual criminal," no error would be

shown. See *Hughes v. State*, 562 S.W.2d 857 (Tex.Cr.App.1978).

This ninth ground of error, without merit, is overruled.

Ground of error ten asserts that the trial court erred in permitting the accused to "effectively discharge" his court appointed attorneys at the punishment phase of trial without either making inquiry into his ability to represent himself, or admonishing him of the dangers and disadvantages of self-representation.

The record reflects that prior to the presentation of punishment evidence, defense counsel advised the trial judge that appellant wished to address the court outside the jury's presence. Appellant was permitted to take the stand; he stated that he had advised his attorneys that he intended to take the stand "for the purpose of telling the jury that [he] would desire the death penalty;" that he had instructed his attorneys not to present any evidence on his behalf; that his attorneys were not to crossexamine the State's witnesses; that his attorneys were to make no final argument in his behalf; and that each of these instructions was in conflict with, and against the advice of counsel.

The trial court commented only that appellant's decision to take the stand was his own, but cautioned defense counsel that whether witnesses are to be crossexamined, or evidence presented,

"That is a matter in the Court's opinion that is the decision of counsel. I would instruct you gentlemen for your own protection that you have a matter of ethics in that regard." [29]

Thereafter, the record reveals that counsel ably, if not extensively, crossexamined three witnesses called to establish an extraneous transaction constituting a rape of-

---

**28.** "Whether there is a probability that the defendant would commit *criminal acts of violence* that would constitute a continuing threat to society." Article 37.071(b)(2), V.A.C.C.P.

**29.** This observation by the trial court is correct. See State Bar of Texas, Rules and Code of Professional Responsibility, EC 7–7 (1972), and

*Sapata v. State*, 574 S.W.2d 770 (Tex.Cr.App. 1978); see also comments of (then) Judge Warren E. Burger of the U. S. Court of Appeals for the D. C. Circuit at National Defender Conference, National Defender Project, quoted in *Landers v. State*, 550 S.W.2d 272, 280 (Tex.Cr.App. 1977); cf. *Rios v. State*, supra, at 91.

fense committed by appellant.[30] Also reflected by the record is defense counsel's careful perusal of penitentiary records of appellant's prior convictions; as a result, prejudicial matters were deleted therefrom. And contrary to appellant's instructions, counsel gave what we believe the State correctly characterizes as "stirring jury arguments against capital punishment."

Thus, we are unable to agree with the factual premise asserted which underlies this entire ground of error: The record simply does not support a finding that appellant "effectively discharged" his attorney at the critical punishment phase of trial. Cf. *Maddox v. State*, 613 S.W.2d 275 (Tex.Cr.App.1981) (Opinion on State's Motion for Rehearing). As such, this ground of error is overruled.

In his eleventh and final ground of error, appellant contends the evidence is insufficient to support the jury's "yes" verdicts returned upon the two special issues submitted at the punishment phase, and which underlie the trial court's assessment of his punishment at death.[31]

During the punishment phase of trial, the State initially reoffered all evidence adduced at the guilt phase. Also offered was the testimony of an extraneous offense victim which has been discussed in the preceding two grounds of error. As noted there, defensive crossexamination cast doubt upon the seventeen year old witness' claim that she was kidnapped and raped by appellant; however, her assertion that appellant severely beat her face with his hands and a pistol, was not only uncontradicted but the fact of her injuries was also corroborated by both a police officer and a former assistant district attorney. This incident occurred less than seven months prior to the murder of Michael Underwood.

Then, though the testimony of Sergeant Jerry Satcher of the Harris County Sheriff's Identification Division and official records of the Texas Department of Corrections, the State established appellant's prior convictions for five offenses: burglary committed in 1963 on which a two year probation was subsequently revoked five months later; three forgeries committed in 1966 on which he served three concurrent five year sentences; and, possession of marihuana committed in 1971 on which an eight year sentence was assessed.

The only witness called by the defense, against the advice of counsel, was the appellant; he testified:

"You heard what the coroner said. You all found me guilty of one of the most brutal murders that have ever been in Houston. If I had found a man guilty of that type of murder I figure he deserves the death penalty and that's what I am asking you is that the jury give me the death penalty. That's what I want."

Conceding a tremendous amount of confusion and dissension among the bench and bar over the meaning and import of the word "deliberately" as employed in the first

---

**30.** For example, defense crossexamination of the victim of the extraneous rape established that despite her claim of being kidnapped by appellant, she had gone back inside her house for five minutes while appellant waited outside before she entered his car "against her will," and that the rape had occurred at a well known "whorehouse."

**31.** Article 37.071, V.A.C.C.P., provides in relevant part:

"* * *

(b) On conclusion of the presentation of the evidence, the court shall submit the following issues to the jury:

(1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasona-

ble expectation that the death of the deceased or another would result;

(2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; ...

\* \* \* \* \* \*

(c) The state must prove each issue submitted beyond a reasonable doubt, and the jury shall return a special verdict of 'yes' or 'no' on each issue submitted.

\* \* \* \* \* \*

(e) If the jury returns an affirmative finding on each issue submitted under this article, the court shall sentence the defendant to death.

special issue,[32] we cannot say appellant's conduct which caused the death of Michael Underwood presents a close question in this regard.

The evidence most favorable to the jury's verdict reflects the six foot appellant bludgeoned the head of the deceased at the base of his skull as he lay on a concrete slab, hitting him some ten times with the butt of a shotgun which appellant raised high over his own head before striking each blow. There was evidence that the shotgun butt splintered at the scene of the murder. The attending pathologist testified it was unnecessary to use an electric saw on the deceased's head because it "had been fractured in such a fashion that all I had to do was pick off the pieces" of skull and it exposed the entire brain. The brain itself "had been split into [sic] cross-wise;" "blood came out both ears and brain tissue and bone also came out of the right ear. * * The nose was fractured. * * * The jaw bones—. . . were both fractured." The "readily palpable fractures over the entire skull" were characterized as "eggshell fractures:" "This is exactly the way this head looked—like a broken egg." Dr. Erickson stated from four to six hundred pounds of pressure per square inch are required just to fracture a human skull; she testified that the only time she had ever seen a skull fractured as severely as that of Michael Underwood was in a case of a woman who had been run over by an eighteen wheel truck. The cause of death was a crushed head.[33]

■ The evidence is sufficient to support the jury's verdict that appellant's conduct that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of Michael Underwood would result, and we so hold.

■ Attacking the sufficiency of the evidence to support the jury's verdict upon the second special issue, appellant essentially complains that without Kay's testimony, the circumstantial evidence of his participation in the murder is inadequate; that the prior convictions established by the State were not for crimes of violence against persons; and, that the State failed to prove appellant had raped the extraneous offense witness.

While it is true that the crossexamination of the extraneous offense witness effectively diminished her claims in some regards, it is nevertheless clear she suffered a severe beating at the hands of appellant. This incident, followed only months later by appellant's commission of the kidnapping, rape and robbery of Kay and the kidnapping, robbery and brutal murder of the deceased—all crimes of violence against persons—are highly probative of whether there is a probability that he will commit criminal acts of violence, constituting a continuing threat to society. And though burglary is not *necessarily* a violent crime against a person, it is certainly pregnant with that potential; in retrospect appellant's commission of a burglary in 1963 may well have been a harbinger.

Be that as it may, in *Muniz v. State*, 573 S.W.2d 792, 795 (Tex.Cr.App.1978) the Court stated:

"The circumstances of the offense itself can sustain a 'yes' answer if they are severe enough. *Burns v. State*, 556 S.W.2d 270, or can fail to support it if they are not and are unsupplemented by

32. E.g., Practice Commentary following V.T.C.A. Penal Code, § 19.03; oral argument on the constitutionality of Texas death penalty procedure in *Jurek v. Texas*, 19 CrL 4007 (1976); *Blansett v. State*, 556 S.W.2d 322, 327 n. 6 (Tex.Cr.App.1977); Black, *Due Process for Death: Jurek v. Texas and Companion Cases*, 26 Cath.U.L.Rev. 1, 3 (1977); Crump, *Capital Murder: The Issues in Texas*, 14 Hous.L.Rev. 551, 555 (1977); Goldstein, "*Objections to the Court's Charge on Punishment;*" "*Objection No. 16*" at G-191 (printed in Capital Murder

Defense Course Materials prepared for the Criminal Defense Lawyer's Project, December 1978); and *Wilder v. State*, 583 S.W.2d 349 (Tex.Cr.App.1979).

33. Dr. Erickson made what she called a "crude estimate" that the deceased could have lived "fifteen or twenty minutes and maybe even longer" after the beating; this was based upon her finding that his lungs were "two and one-half times normal weight."

other evidence. *Warren v. State*, 562 S.W.2d 474 (Tex.Cr.App.1978)."

Though appellant cites *Warren,* supra, as well as other capital cases in which the evidence supporting the verdict on the second special issue has been found wanting, the circumstances of the offense presented here are surely in marked contrast to those. We need not rechronicle even in part the nightmare crafted so carefully by appellant on April 11, 1978, in order to comprehend fully the shocking nature of his crime or the most dangerous aberration of character it evinces. Considering the random selection of his young victims, the calculated, remorseless brutality of the manner in which he obliterated another human life and the levity with which he exploited the terror he generated in the female witness to his atrocity, this Court cannot say that the jury would have been unjustified in returning their verdict of "yes" to the second special issue based alone on the facts of the offense. *Burns,* supra.[34] We accordingly hold the evidence is sufficient to support that verdict.

Appellant's eleventh ground of error is overruled.

Satisfied that the provisions of our capital murder statutes have been constitutionally applied in this case, we affirm the judgment.[35]

TEAGUE, J., dissents.

**34.** *Burns v. State,* 556 S.W.2d 270 (Tex.Cr.App. 1977), *relief granted on other grounds sub nom, Burns v. Estelle,* 592 F.2d 1297 (CA5 1979) *rehearing en banc granted,* 598 F.2d 1016 (CA5 1979), *order granting relief aff'd,* 626 F.2d 396 (CA5 1980).

**35.** This cause involves the second trial of appellant for the same capital murder offense. The first conviction was reversed for error in overruling appellant's motion to quash that indictment, this Court holding in effect that its allegations were not adequate to meet "the constitutional requisite of notice to the accused of the facts constituting the charge against him,"

*King v. State,* 594 S.W.2d 425, 426 (Tex.Cr. App.1980). We note that eight days after denial of rehearing a proper indictment was returned, constituting the instant case; appellant was accorded a speedy public trial that ended with verdict of the jury on punishment May 20, 1980. In affirming the judgment of the trial court today, this Court has discharged the same constitutional duties and functions to review claimed errors in this cause, as it did in the appeal of the earlier cause, to the end that an accused be tried according to that process which is constitutionally due. That end has been met.